U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF VERMONT**

2022 JUL 26 PM 3: 35

**JOHN DOE,**                                                )                                   CLERK
                                                            )
            Plaintiff,                                       )                     BY_____
                                                            )                     DEPUTY CLERK
      v.                                                     )   Civil Action No. 2:22-cv-144
                                                            )
**THE UNIVERSITY OF VERMONT AND**                            )
**STATE AGRICULTURAL COLLEGE;**                              )            **COMPLAINT**
**THE BOARD OF TRUSTEES OF THE**                             )
**UNIVERSITY OF VERMONT AND STATE**                          )            **JURY TRIAL**
**AGRICULTURAL COLLEGE; KATHERINE**                          )            **DEMANDED**
**SPENCE,** individually and as agent for The University     )
of Vermont and State Agricultural College; **EMILY**         )
**MCCARTHY,** individually and as agent for The              )
University of Vermont and State Agricultural College;        )
**ANNA EPSHTEYN,** individually and as agent for The         )
University of Vermont and State Agricultural College; and    )
**THOMAS MERCURIO;** individually and as agent for           )
The University of Vermont and State Agricultural             )
College;                                                     )
                                                            )
            Defendants.                                      )

Plaintiff John Doe[1] ("Plaintiff" or "Doe"), by his attorneys Nesenoff & Miltenberg, LLP,

as and for his Complaint against Defendants, The University of Vermont and State Agricultural

College ("UVM" or "the University"), the Board of Trustees of The University of Vermont and

State Agricultural College ("Board of Trustees" or "Board"), Katherine Spence ("Spence"), Emily

McCarthy ("McCarthy"), Anna Epshteyn ("Epshteyn"), and Thomas Mercurio ("Mercurio")

(collectively, "Defendants"), respectfully alleges as follows:

---

[1]  Plaintiff has filed herewith a motion to proceed by pseudonym.

## THE NATURE OF THIS ACTION

1.      This case arises out of the biased, unlawful, and improper actions and inactions of Defendants in inadequately investigating and wrongly adjudicating false allegations made by UVM undergraduate student Jane Roe[2] against Plaintiff, a male undergraduate student, for alleged violations of UVM's Sexual Harassment and Misconduct Policy V.7.11.2 (the "Policy").

2.      On December 3, 2018, Plaintiff was notified that he stood accused of having committed sexual assault and/or sexual exploitation upon Jane Roe in her dorm room on October 13th of that year.

3.      On information and belief, Jane Roe did not seek to file a report immediately after the alleged assault, but rather, filed the allegation ten days after the incident, on October 23, 2018, amid pressure from her overbearing girlfriend, as outrage permeated UVM's campus, including approximately 1,000 students who protested the appointment of Justice Brett Kavanaugh to the Supreme Court.

4.      On October 12, 2018, when Roe and her girlfriend were on "a break," she and her friend Doe went to a party with other mutual friends. After the party, Roe, Doe, and three other female guests of Roe returned to Roe's dorm room on campus to hang out. Doe and Roe fell asleep in Roe's bed, while the three other guests slept in the same room. Roe alleged she was sexually assaulted by Doe while the guests slept a mere few feet away.

5.      Roe submitted her initial complaint through UVM's online reporting form, and alleged she was awakened to Doe touching her as he tried "getting into [her] pants." Roe claims she rejected the alleged advances then went back to sleep. Roe further alleged she woke up, again, to Doe digitally penetrating her. Roe claimed Doe then placed her hand on his penis. Doe denied

---

[2] Roe is referred to herein pseudonymously.

all of Roe's allegations.  He explained he was awakened by Roe grinding on his pelvic area and that Roe manually stimulated him to completion.  The two friends slept together the remainder of the night, along with the other women in the room.  The following day, Roe asked Doe to go on a hike and, later that day, invited him to attend another party with her.

6.      Throughout the investigation of the case, numerous pieces of evidence were uncovered that called into question Roe's claims, including:

a.  The aforementioned conduct of Roe, including her delay in reporting, and submitting the complaint at the behest of her overbearing girlfriend amid the inflamed climate at UVM immediately after the Kavanaugh protests;

b.  Roe invited Doe to go on a hike the morning after the alleged assault, invited him to return to her dorm room for a pre-party and then to a party the following evening;

c.  Roe's statements included multiple inconsistencies that Title IX Investigator McCarthy inexplicably found strengthened Roe's credibility, including, but not limited to, Roe's differing recollections of when Doe digitally penetrated her vagina when she woke up, and Roe's omission of her manual stimulation of Doe's penis to climax;

d.  A text message exchange revealed Roe and one of her witnesses conspired to corroborate each other's statements to the non-discerning investigator; all of Roe's witnesses knew about the allegations in violation of the Policy's confidentiality provision, but the investigator failed to inquire about these prohibited communications or consider the coordinated statements detrimental to Roe's credibility; and

e.  Roe's embittered, overbearing ex-girlfriend, MK, threatened Doe with physical harm on October 16, 2018, after she learned of Roe's choosing to live with Doe and their friends as well as the sexual encounter.  MK also texted Doe the same day to advise if he was "still in attendance at the university," there was "absolutely no way" he would be living with Roe.  The investigators failed to consider this potential motive, and pressure, as affecting Roe's credibility.

f.  Roe admitted she discussed her complaint with UVM Professor Holly Busier prior to filing the report with UVM's Title IX Office on October 24, 2018.  The complainant also acknowledged that Professor Busier advised Roe's allegations would be difficult to prove as the matter was "he said, she said" lacking corroborating evidence, much like Dr. Ford's allegations against Justice Kavanaugh.  Busier failed to report the allegations to UVM Title IX, as required under the Policy.  More troubling, however, was Roe's producing two loose leaf pieces of papers that purported to be a "contemporaneous" journal entry, from Roe's journal.  The self-serving alleged entry was accepted as genuine by the investigators, who never sought to review the original entries or the journal, even though they were aware of the previously unreported meeting with Busier.

g.  At the sanction hearing, Roe claimed the incident led her to abuse alcohol and drugs, including LSD, as a means of escape.  Upon information and belief, Roe falsely exaggerated the extent to which her consumption increased, as she was known to drink to extremes and experiment with hard drugs well before October 2018.  The misinformation was provided for the ulterior purpose of maximizing the sanction imposed on Doe.

4

7.     UVM's "investigation" in this case was little more than an inquisition masquerading as an inquiry, wherein the investigator deliberately failed to pursue any leads that could discredit Jane Roe, and ignored inconsistent statements as well as witness tampering by Roe. As a result of the investigator's biased investigation, and hearing officer Anna Epshteyn's thinly veiled hatred of the male respondent, he was found responsible for sexual assault and sexual exploitation for acts he simply did not commit.  Plaintiff was initially assigned the most severe sanction of expulsion, before the appeals officer, and former general counsel of UVM, Thomas Mercurio, reduced the expulsion to a suspension with an eye toward minimizing damages in any future litigation for the unconstitutional proceeding.

8.     The investigators' general acceptance of complainants' credibility and complete lack of discernment in this case, was especially dangerous given UVM's use of the widely discredited "single investigator model," wherein a single individual investigates and adjudicates claims of sexual misconduct.  The single investigator model, criticized as prone to abuse and impermissible bias in recent years, was expressly prohibited in the August 14, 2020, changes to Title IX regulations, for the model's lack of fundamental fairness.

9.     UVM's entire disciplinary process against Plaintiff lacked such fairness and was replete with errors, including but not limited to Defendants':

      a.   failure to provide sufficient and accurate notice of the allegations;

      b.   failure to conduct a fair and impartial investigation;

      c.   failure to investigate and consider potentially exculpatory witnesses/evidence;

      d.   failure to properly apply the preponderance of the evidence standard as the burden of proof;

      e.   failure to objectively evaluate the evidence;

f.   failure to provide Plaintiff an opportunity to cross-examine Roe at a live hearing before a neutral arbiter;

g.   abuse of discretion in the erroneous and unwarranted finding of responsibility;

h.   abuse of discretion in the issuance of an unduly harsh sanction that did not consider the individual facts of the case and failed to acknowledge established mitigating factors; and

i.   failure to provide Plaintiff with a genuine avenue for a fair appeal, instead of having UVM's counsel reject the majority of Plaintiff's appeal, reducing the sanction to a one-year suspension in lieu of overturning the finding of responsibility as was required, and supporting UVM's employees as a matter of course.

10.   By employing gender-based, pre-determined presumptions of Plaintiff's guilt throughout the process, in the face of outrage-fueled pressure from the UVM community, Defendants anti-male bias led to an erroneous outcome in violation of Title IX of the Education Amendments of 1972.

11.   By employing a biased, summary adjudicative process, Defendants deprived Plaintiff of adequate notice and a meaningful opportunity to be heard, in violation of the Due Process Clause of the Fourteenth Amendment.

12.   By denying Plaintiff equal access to UVM's services, policies, and procedures because of his sex, Defendants violated Vermont's Discrimination in Public Accommodations Act ("DPA" or "Accommodations Act"), 9 V.S.A. § 4502.

13.     By violating their own policies and depriving Plaintiff of a fair and impartial disciplinary process, Defendants breached express and implied agreements with Plaintiff and acted in bad faith in failing to fulfill their promises to him as an enrolled student paying tuition at UVM.

14.     As a result of Defendants' discriminatory and unlawful conduct, Plaintiff has sustained damages to his future education and career prospects.

15.     Accordingly, Plaintiff brings this action to obtain monetary and injunctive relief.

## THE PARTIES

16.     Plaintiff John Doe is a natural person, resident of Connecticut, and a current undergraduate student at UVM.

17.     UVM is a partially federally funded, public research university in Burlington, Vermont, with an undergraduate enrollment of approximately 10,000 students.

18.     The Board of Trustees of UVM is comprised of twenty-five members who, as a Board, are responsible for the entire management and control of the property and affairs of the University. The Board operates in accordance with the corporate bylaws of UVM, which are governed by the laws of the state of Vermont.

19.     Katherine Spence is a natural person and a Title IX investigator for UVM. On information and belief, Spence is a resident of Vermont.

20.     Emily McCarthy is a natural person and a Title IX investigator for UVM. On information and belief, McCarthy is a resident of Vermont.

21.     Anna Epshteyn is a natural person, the Student Conduct Assistant Director for UVM, and served as the Sanctioning Panel hearing chair in the instant matter. On information and belief, Epshteyn is a resident of Vermont.

22.     Thomas Mercurio is a natural person and the Student Conduct Appeals Officer for UVM.  On information and belief, Mercurio is a resident of Vermont.  On information and belief, Mercurio was UVM's in-house counsel for nearly thirty years before taking on his role as Appeals Officer.

## JURISDICTION AND VENUE

23.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the laws of the United States, specifically, under Title IX of the Educational Amendments of 1972 and the Fourteenth Amendment to the U.S. Constitution.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367, as the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

24.     This Court has personal jurisdiction over Defendants on the ground that Defendants resided and/or conducted business within the State of Vermont during the relevant time period.

25.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I.     BACKGROUND.

        A.     The April 2011 "Dear Colleague Letter": The Office for Civil Rights Places Pressure on Universities to Aggressively Pursue Sexual Misconduct Complaints.

26.     On April 4, 2011, the Department of Education's Office for Civil Rights ("OCR") issued a guidance letter to colleges and universities in receipt of federal funding, which became widely known as the "April 2011 Dear Colleague Letter" (the "DCL").

27.     The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972 and its regulations and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects." DCL at 4.

28.     The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* Joseph Shapiro, *Campus Rape Victims: A Struggle for Justice*, National Public Radio (Feb. 24, 2010), http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress through college disciplinary proceedings, and how victims who did engage in the college disciplinary process suffered additional trauma as a result.

29.     The OCR further relied on faulty statistics in sounding its "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL at 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline . . . when discussing our country's problem with rape and sexual assault on campus." *See* Christopher Krebs and Christine Lindquist, *Setting the Record Straight on "1 in 5"*, Time Magazine (Dec. 14, 2015), http://time.com/3633903/campus-rape-1-in-5-sexual-assault-setting-record-straight/.

30.     Relying on the faulty one-in-five statistic, the OCR, through the DCL, minimized due process protections for the accused by, among other things, mandating the adoption of a relatively low burden of proof—"more likely than not"— in cases involving sexual misconduct, expressly prohibiting colleges from applying a higher standard of proof.

31.     The DCL advised that schools responding to Title IX complaints should "minimize the burden on the complainant" and focus on victim advocacy.

32.     Despite its purported purpose as a mere guidance letter, the Department of Education treated the DCL as a binding regulation and pressured colleges and universities to aggressively pursue investigations of sexual assault on campus, which they obliged over the following decade.

33.     On April 19, 2014, the OCR issued additional directives to colleges and universities in the form of a guidance document titled Questions and Answers on Title IX and Sexual Violence (the "2014 Q&A").

34.     Like the DCL, the 2014 Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." The 2014 Q&A advised schools to adopt a "trauma-informed" approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." 2014 Q&A at 31. The Q&A further advised that, although "the rights established under Title IX must be interpreted consistently with any federally guaranteed due process rights . . . a school should ensure that any due process rights do not restrict or unnecessarily delay the protections provided by Title IX *to the complainant*." 2014 Q&A at 13 (emphasis added).

35.     In the same month that the OCR issued its 2014 Q&A on Title IX, the White House issued a report titled *Not Alone*, which included a warning that if the OCR finds a school in violation of Title IX, the "school risks losing federal funds." *See* White House Task Force to Protect Students from Sexual Assault, *Not Alone* (Apr. 2014).  The report further advised that the Department of Justice ("DOJ") shared authority with OCR for enforcing Title IX, and could, therefore, initiate an investigation, compliance review, and/or litigation against schools suspected of violating Title IX.

36.     In June 2014, then-Assistant Secretary of Education Catherine Lhamon testified before the United States Senate, warning that if the OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice. *See* Testimony of Catherine E. Lhamon, Asst. Secretary OCR, U.S. Department of Education (June 26, 2014).

37.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators.  To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. *See Title IX: Tracking Sexual Assault Investigations*, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited Mar. 1, 2019).

38.     The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges to aggressively pursue and punish male students accused of sexual misconduct.  In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed: "There is a certain hysteria in the air on this topic, . . . .  It's really a surreal situation, I think." *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*, National Public Radio (Aug. 12, 2014), https://www.npr.org/2014/08/12/339822696/how-

campus-sexual-assaults-came-to-command-new-attention.   Neal explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."

39.     Likewise, on September 1, 2014, the Chronicle of Higher Education noted that colleges were facing "increasing pressure from survivors and the federal government," including claims that college campuses had become "hazardous places" for female students.  *See* Robin Wilson, *Presumed Guilty: College Men Accused of Rape Say the Scales are Tipped Against Them*, Chronicle of Higher Education (Sept. 1, 2014), https://www.chronicle.com/article/Presumed-Guilty/148529.  For example, the article noted that different standards were being applied to male students versus female students: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." *Id.*

40.     Notably, a study by the National Bureau of Economic Research found that opening more Title IX investigations benefits colleges in their application submission rates and has no negative impact on securing donations.  *See* Jason M. Lindo et al., *Any Press is Good Press? The Unanticipated Effect of Title IX Investigations on University Outcomes*, National Bureau of Economic Research, Working Paper No. 24852 (July 2018), http://www.nber.org/papers/w24852.

41.     The study found "no evidence [that] federal Title IX investigations reduce students' interest in a university.  Instead, [it found] evidence that these investigations increase freshman applications and enrollment, for both female and male students." *Id.*  The study further found that "[f]ederal Title IX investigations appear to have no effect on student retention, as the enrollment

of continuing students is unaffected," and that "analysis of . . . data suggests that federal Title IX investigations have no detectable effects on donations." *Ibid.* In other words, colleges and universities have everything to gain from aggressively pursuing Title IX cases, and nothing to lose.

42.     In response to pressure from OCR and the DOJ, educational institutions like UVM severely limited the procedural protections afforded to respondents, like John Doe, in sexual misconduct cases.

**B.  The Rescission of the 2011 DCL and UVM's Continued Reliance on an Unfair, Unreliable, Widely Discredited Process.**

43.     On July 19, 2017, twenty State Attorneys General published a letter to the United States Secretary of Education, Betsy DeVos ("DeVos"), urging the Secretary to maintain the sexual assault guidelines for college campuses as set forth in the DCL and related guidance and regulations.  Among those signing the letter was T.J. Donovan, Vermont Attorney General. The letter was written "to express . . . serious concern over reports that [DeVos's] office is preparing to roll back important protections for survivors of sexual assault on college campuses." *See* Josh Shapiro, et al., Letter to Elisabeth DeVos (July 19, 2017), *available at* https://www.documentcloud.org/documents/3897422-Title-IX-Letter-to-Secretary-DeVos.html.

44.     The Letter began by reciting various statistics about sexual assault, all of which related to the prevalence of assault against women, specifically college women.  There were no statistics or acknowledgment of men as victims of sexual assault. *Id.* at 1.

45.     Despite the Attorneys General's letter advocating for limited due process on campuses, on September 7, 2017, DeVos vowed to replace the "failed system" of campus sexual assault enforcement to ensure fairness for both accusers and the accused, proclaiming that "one person denied due process is one too many."  Press Release, *Secretary DeVos Prepared Remarks*

*on Title IX Enforcement* (Sept. 7, 2017), *available at* https://www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.

46.     DeVos explained, "[t]he truth is that the system established by the prior administration has failed too many students;" specifically, "[t]he notion that a school must diminish due process rights to better serve the 'victim' only creates more victims." *Id.*

47.     Acknowledging the massive pressure placed on universities by the DCL, DeVos stated, "[n]o school or university should deprive any student of his or her ability to pursue their education because the school fears shaming by – or loss of funding from – Washington." *Id.*

48.     With respect to the rights of the accused, DeVos declared, "[e]very student accused of sexual misconduct must know that guilt is not predetermined," and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination." *Id.* She continued, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one." *Id.*

49.     As one college administrator observed shortly thereafter, "I think that [DeVos's] reference to due process is because of her overall assessment that the pendulum has swung too far in favor of complainants as a result of the directives in the Dear Colleague Letter." Sarah Asch, *Federal Changes to Title IX on Sexual Assault Could Impact Middlebury*, The Middlebury Campus (Sept. 20, 2017), https://middleburycampus.com/36090/features/federal-changes-to-title-ix-on-sexual-assault-could-impact-middlebury/.

50.     On September 22, 2017, the OCR formally rescinded the DCL and the 2014 Q&A and put in place interim guidance (the "2017 Q&A"), while the current administration reviews and revises its practices regarding the adjudication of complaints of sexual misconduct on college campuses. *See* Dep't of Ed., Dear Colleague Letter (Sept. 22, 2017),

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf; *see also* Dep't of Ed., *Q&A on Campus Sexual Misconduct* (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

51.  In rescinding the 2011 DCL, the OCR noted that it had placed "improper pressure upon universities to adopt procedures that do not afford fundamental fairness," and "lack the most basic elements of fairness and due process, are overwhelmingly stacked against the accused, and *are in no way required by Title IX law or regulation.*" *Id.* (citations omitted) (emphasis added).

52.  In that regard, the 2017 Q&A prohibits universities from relying on fixed rules or assumptions that favor complainants over respondents.

53.  The 2017 Q&A cautions that "[t]raining materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially," and the same standard applies for "[d]ecision-making techniques or approaches." 2017 Q&A at 4, 5.

54.  The 2017 Q&A further directs that those issuing sanctions must consider "the impact of separating a student from her or his education," and sanctions should therefore "be proportionate to the violation." *Id.* at 6.

55.  The 2017 Q&A requires universities to "adopt and publish grievance procedures that provide for a prompt and *equitable* resolution of complaints of sex discrimination, including sexual misconduct." *Id.* at 3 (emphasis added).  In that regard, the "elements in evaluating whether a school's grievance procedures are prompt and equitable [] includ[e] . . . ensur[inga] an *adequate, reliable, and impartial* investigation of complaints." *Ibid.* (emphasis added).

15

56.     The 2017 Q&A also requires investigators to "synthesize *all available evidence*—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case." *Id.* at 4 (emphasis added).

57.     The 2017 Q&A suggests that the policies and procedures in place at UVM at all times relevant to this lawsuit—which were tailored in such a way as to comply with the DCL under the threat of loss of federal funding—were unfair and, ultimately, contrary to the goal of gender equality in Title IX proceedings.

58.     In November 2018, the Department of Education released its proposed new Title IX regulations. *See* https://www2.ed.gov/about/offices/list/ocr/docs/title-ix-nprm.pdf.

59.     Although not binding until August 14, 2020, the proposed regulations expressly disapproved of UVM's policies and procedures for adjudicating sexual misconduct claims—specifically, the use of the single-investigator model:

> Proposed section 106.45(b)(4) would address the process that recipients use to make determinations regarding responsibility, with requirements designed to ensure that recipients make sound and supportable decisions through a process that incorporates appropriate protections for all parties while providing adequate notice of such decisions. Requiring the decision-maker to be different from any person who served as the Title IX Coordinator or investigator *forecloses a recipient from utilizing a "single investigator" or "investigator-only" model for Title IX grievance processes*. The Department believes that fundamental fairness to both parties requires that the intake of a report and formal complaint, the investigation (including party and witness interviews and collection of documentary and other evidence), drafting of an investigative report, and ultimate decision about responsibility *should not be left in the hands of a single person*. Rather, after the recipient has conducted its impartial investigation, a separate decision-maker must reach the determination regarding responsibility; that determination can be made by one or more decision-makers (e.g., a panel), but *no decision-maker can be the same person who served as the Title IX Coordinator or investigator*.

(emphasis added).

16

60.     The proposed new regulations would also require the school to provide a live hearing and some form of cross-examination:

> For institutions of higher education, the recipient's grievance procedure *must provide for a live hearing*. At the hearing, the decision-maker *must permit each party to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility*. . . . At the request of either party, the recipient must provide for cross-examination to occur with the parties located in separate rooms with technology enabling the decision-maker and parties to simultaneously see and hear the party answering questions. The decision-maker must explain to the party's advisor asking cross-examination questions any decision to exclude questions as not relevant. *If a party or witness does not submit to cross-examination at the hearing, the decision-maker must not rely on any statement of that party or witness in reaching a determination regarding responsibility.*

> (emphasis added).

61.     Despite the sweeping changes caused by the rescission of the 2011 DCL and the implementation of the 2017 Q&A, and despite the imminent changes to Title IX regulations patently rejecting UVM's procedures as fundamentally unfair and vulnerable to abuse, UVM remained steadfast in its embrace of the biased and unreliable single investigator model in the time period when Plaintiff was persecuted in the instant matter. *See* Brandon Arcari and Sawyer Loftus, *New Federal Changes Could Force UVM to Change Sexual-Assault Policies*, Vermont Cynic (Jan. 2, 2019), https://vtcynic.com/news/new-federal-changes-could-force-uvm-to-change-sexual-assault-policies/ ("UVM Communications Director Enrique Corredera stated in a Nov. 27 email to the Cynic" that "UVM will be providing input on the changes but doesn't expect changes to be put into effect within the next six months.").

62.     In fact, not only did UVM insist on continuing to use the poorly developed, inadequate, and inherently unreliable process for adjudicating Title IX claims, it went so far as to

oppose the proposed new regulations on that very basis. *See* E. Thomas Sullivan, Letter to Secretary DeVos and Assistant Secretary Marcus (Jan. 20, 2019).

63.     Among UVM's chief reasons for opposing the ban on the single-investigator model: it would require UVM to "invest in additional resources"—in other words, to spend money. *Id.* at 2.

64.     UVM also opposed the requirement of live hearings and cross-examination. Apparently, UVM believes that affording the accused such basic due process protections would "present[] conflicts of interest" for UVM. *Id.* at 3.

65.     UVM further opposed the rule that witness statements could not be relied upon if the witness refuses to attend the live hearing so that their credibility could be properly assessed by a neutral decision-maker. "Under our current procedure," UVM insisted, "the veracity of all statements and evidence, and the credibility of those offering them, are weighed by trained investigators." *Id.* at 3. If the instant case is any indication of their investigators' ability, or commitment, to make objective credibility assessments, then UVM's confidence was misplaced.

66.     Finally, UVM opposed the provision that would require university decision-makers to provide an explanation for excluding certain questions on cross-examination. According to UVM's president, requiring a decision-maker to explain herself "could have a chilling effect on their willingness to appropriately control the conduct of the live hearing." *Id.* at 4. In other words, UVM opposed a rule that would prevent a decision-maker from acting arbitrarily, without reason.

67.     UVM also insisted in its letter that "UVM's current process," including the use of the single-investigator model, "is informed by evidence-based best practice, [and] comports with due process." *Id.* at 2.

68.     UVM made this claim despite the fact that the Association of Title IX Administrators ("ATIXA") has stated for years that the single-investigator model violates "[t]he hallmarks of an appropriate [Title IX] investigation in the college and university setting." *See, e.g.*, Michael Henry, et al., *The 7 Deadly Sins of Title IX Investigations*, The 2016 ATIXA Whitepaper at 13.

69.     As one District Court has explained, "[t]he dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious.  No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 606 (D. Mass. 2016).

70.     Indeed, the Sixth Circuit has firmly established that in disciplinary cases where credibility is at issue, cross-examination is required in order to comport with due process. *See, e.g., Doe v. Baum*, 903 F.3d 575, 585-586 (6th Cir. 2018).

71.     Tellingly, UVM argued that changes to its Title IX policies were unnecessary because "[p]rotections already exist. . . ultimately via redress in civil courts if a party believes that a particular investigation or conduct proceeding runs afoul of due process." E. Thomas Sullivan, Letter to Secretary DeVos and Assistant Secretary Marcus (Jan. 20, 2019), at 2.  In other words, UVM preferred to force its students to file lawsuits, like the instant one, in lieu of providing due process protections in the first place.

72.     On November 16, 2018, the Department of Education released proposed Title IX regulations, subject to "notice-and-comment rulemaking." https://www.ed.gov/news/press-releases/secretary-devos-proposed-title-ix-rule-provides-clarity-schools-support-survivors-and-due-process-rights-all.

73.     Despite a different direction announced by the Trump Administration, colleges, universities, and educational programs including UVM mostly continued with victim-centered practices and policies in place during the Obama Administration, holding on, as a matter of ideological commitment, to what is a gender biased enforcement of Title IX, until the moment the final rule became effective on August 14, 2020.

74.     In January 2020, NASPA, the national organization of Student Affairs Administrators in Higher Education, which has 15,000 members representing more than 1500 institutions, issued a study, *"Expanding The Frame: Institutional Responses to Students Accused of Sexual Misconduct."* (available at https://www.naspa.org/report/expanding-the-frame-institutional-responses-to-students-accused-of-sexual-misconduct) The study, intended to refute "the common narrative that institutions are not concerned with responding parties' rights in sexual misconduct cases," essentially evidenced to the contrary that widespread institutional bias against the accused starts at the very inception of a complaint, prior to any investigation or adjudication.

75.     In a process governed by the enforcement of Title IX gender equality, and in which the overwhelming majority of accused students are male, the survey reported that only 5% of schools have even one full-time employee to assist accused students; 85% have no budget dedicated specifically to providing services for accused students; and for accused students "no established best practices currently exist, and most institutions are only just developing these programs, identifying what specific services are needed, and exploring what is equitable or equal." While alleged victims have entire departments of advocates funded by the institution dedicated to their needs, only 13% of colleges and universities have a staff member reach out "directly to responding parties about support services available." The study suggests that accused students are

left to defend themselves by administrators "due to perceived pushback from members of the campus community who disagree with providing respondent services."

76.     On May 6, 2020, the Department of Education released the new Title IX regulations, which amended the Code of Federal Regulations for Nondiscrimination on the Basis of Sex in Education for Programs or Activities Receiving Federal Financial Assistance (the "2020 Title IX Final Rule") which carry the force and effect of law as of August 14, 2020.   ("US Department of Education Releases Final Title IX Rule," available at https://www2.ed.gov/about/offices/list/ocr/newsroom.html).

77.     The 2020 Title IX Final Rule replaced all previously issued OCR guidance, including the rescinded 2001 Title IX Revised Sexual Harassment Guidance.

78.     The 2020 Title IX Final Rule provides respondents with procedural rights which the Plaintiff was deprived of during his own disciplinary proceeding. (*See* "Summary of Major Provisions of the Department of Education's Title IX Final Rule," available at https://www2.ed.gov/about/offices/list/ocr/docs/titleix-summary.pdf).

79.     In stark contrast to previous guidance, the 2020 Title IX Final Rule specified that colleges are only required to pursue Title IX allegations that occur during an institution's education program or activity over which the institution exercised substantial control over both the respondent and the context in which the alleged sexual harassment occurred, leaving off-campus conduct beyond the scope of Title IX jurisdiction.

80.     Following the *Davis*[3] standard outlined by the Supreme Court, the 2020 Title IX Final Rule also narrows the definition of sexual harassment, now defined as unwelcome conduct,

---

[3] *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999).

on the basis of sex, "determined by a reasonable person to be so severe, pervasive, *and* objectively offensive that it effectively denies a person equal access to the recipient's education program or activity," as opposed to the previous administrative guidance definition of "severe, pervasive, *or* objectively offensive." This standard was adopted to "ensure the imposition of consistent requirements in judicial and administrative contexts." *See* Defs' Opp. To Mot. For Prelim. Inj. 23, *Pennsylvania v. DeVos*, No. 1:20-CV-01468 (CJN), 2020 WL 4673413 (D.D.C. Aug. 12, 2020).

81.    Under application of the new Title IX regulations, Plaintiff was deprived by UVM of numerous procedural rights. By way of example and not limitation, the 2020 Title IX Final Rule states that schools must:

    a.  Notify respondents that they are presumed innocent until a finding of responsibility is made;

    b.  Provide the accused with a hearing before any finding of responsibility is made or sanctions are imposed;

    c.  Provide the accused with the right to a live hearing with cross-examination of all witnesses. Such cross-examination must be done directly, orally, and in real time by the party's advisor of choice, who may be an attorney;

    d.  Objectively evaluate all relevant evidence, both inculpatory and exculpatory;

    e.  Avoid credibility determinations based on the status of a student as complainant or respondent;

    f.  Train school decision-makers and investigators on issues of relevance and bias;

    g.  Provide equal opportunities to the complainant and respondent to present facts;

    h.  In the event that a respondent is determined responsible for a policy violation, provide the respondent with a written notice of determination, including the rationale for the determination, and any disciplinary sanctions imposed.

82.    On information and belief, UVM has acknowledged its procedural shortcomings in light of the new regulations as evidenced by its updating of the Policy as of August 13, 2020, the day before the 2020 Title IX Final Rule.

83.     UVM's procrastination and vehement objection to the 2020 Title IX Final Rule until the last possible moment, particularly when the Department of Education has been advocating for the due process protections described therein since 2017 and releasing the rule's key protections in November 2018, demonstrates a devout adherence to the faulty statistics and gender bias inherent in the rescinded DCL.

### C. UVM Faces Years of Internal and External Pressure to Prosecute and Punish Males Accused of Sexual Misconduct.

84.     UVM's use of a biased, unreliable, and fundamentally unfair adjudicatory process is exacerbated by an extensive history of both internal and external pressure on UVM to aggressively prosecute male students accused of sexual misconduct for the purpose of championing female assault survivors.

85.     In 2013, a female UVM student filed a Title IX complaint with the OCR, alleging that while UVM was investigating another female student's claim of sexual harassment by a male professor, UVM permitted that professor to take his students to a conference, where he then sexually harassed the student filing the complaint.  After OCR launched an investigation, the student and UVM entered into a resolution agreement whereby UVM avoided a Title IX violation by agreeing to "review its processes for investigating complaints of sexual harassment brought forward by students."  *See* Corey Dawson, *UVM Quiet on Response to Sexual Harassment Complaint*, Burlington Free Press (Aug. 18, 2016), https://www.burlingtonfreepress.com/story/news/local/2016/08/18/uvm-quiet-response-sexual-harassment-complaint/88514192/.

86.     Two years later, an article in the UVM school newspaper, The Vermont Cynic, discussed sexual assault awareness as an offshoot discussion of women's history month: "March commemorates generations of women who have fought for gender equity and against sexual abuse.

Yet, such violence continues, especially on college campuses. UVM is no exception." *See* Reports of Sexual Assault Unusually High, Vermont Cynic (Mar. 17, 2015) https://vtcynic.com/news/reports-of-sexual-assault-unusually-high/.

87.      In the article, UVM's Campus Victim's Advocate, Judy Rickstad, opined, "Although the system tries to be victim-friendly, it's a very difficult process, some students want to just move on. . . . Also, there's so much victim-blaming that takes place it becomes easier for the victim to stay silent. . . . [I]t's important to believe the survivor's story and to validate that it was not their fault." *Id.*

88.      On information and belief, UVM had only one Victim's Advocate, and she is a woman.  On information and belief, the Campus Victim's Advocate's office is located within UVM's Women's Center, which describes its mission as follows: "We provide advocacy services, empower women and their allies to use their voices, raise awareness about the critical issues facing women, and highlight their many accomplishments."   Together, these factors create a strong impression that UVM's victim services are expressly reserved for female students.

89.      In April 2015, UVM put on a screening of the controversial documentary *The Hunting Ground*, which has been described as "portray[ing] college as so dangerous for young women that the viewer is left with the sense that these students would have been better off posting college rejection videos and staying home." Emily Yoffe, *The Hunting Ground: The Failures of a New Documentary About Rape on College Campuses*, Slate (Feb. 27, 2015), https://www.burlingtonfreepress.com/story/news/local/2016/08/18/uvm-quiet-response-sexual-harassment-complaint/88514192/.

90.      Indeed, a group of 19 Harvard law professors criticized the movie as "provid[ing] a seriously false picture . . . of the general sexual assault phenomenon [on college campuses]."

David Folkenflik, *Acclaimed Documentary About Campus Rape Draws Critics Too*, National Public Radio (Dec. 3, 2015), https://www.npr.org/2015/12/03/458031996/acclaimed-documentary-about-campus-rape-draws-critics-too.

91.     In April 2016, UVM students staged a protest for sexual assault awareness where they recreated the now-infamous "mattress girl" protest that originated at Columbia University. *See* Hannah Carpino, *Mattresses Carried to Protest Sexual Assault*, Vermont Cynic (Apr. 19, 2016), https://vtcynic.com/culture/life/mattresses-carried-to-protest-sexual-assault/.

92.     Notably, the "mattress girl" protest began after Columbia University's Title IX office found the protester's alleged abuser *not responsible* for a violation of the sexual misconduct policy. Nonetheless, the female complainant went on to create a national campaign against the accused, which Columbia University was subsequently sued for sanctioning. *See* Kate Taylor, *Columbia Settles With Student Cast as a Rapist in Mattress Art Project*, New York Times (July 14, 2017).

93.     In April 2017, a male UVM student was arrested for allegedly touching two female students in their dorm rooms while they slept. In response, UVM Communications Director Enrique Corredera told the Burlington Free Press that "[w]e take this very seriously and *we consistently hold people accountable....* UVM is committed to providing education, intervention, prevention initiatives, as well as providing quality support resources." Nicole Higgins DeSmet, *UVM Student Accused of Fondling Classmates,* Burlington Free Press (Apr. 4, 2017), https://www.burlingtonfreepress.com/story/news/2017/04/04/uvm-student-charged-with-sexual-assault/100035744/ (emphasis added).

94.     The story received considerable media coverage, with students telling a local NBC affiliate that "It's kind of scary thinking that that could happen to anybody, *especially being a girl,*"

and "I think it's something that's on a lot of *girls'* minds." Abby Isaacs, *Some UVM Students Shocked After Classmate Charged with Sexual Assault*, NBC5 (Apr. 4, 2017), https://www.mynbc5.com/article/some-uvm-students-shocked-after-fellow-classmate-arrested-for-sexual-assault/9232754 (emphasis added).

95.     The next month, UVM students held an event on campus to help raise awareness of sexual assault. *See* Joey Waldinger, *Survivors Speak out in the Davis Center*, Vermont Cynic (May 1, 2017), https://vtcynic.com/news/survivors-speak-out-in-the-davis-center/.

96.     At the event, survivors of sexual assault, who, on information and belief, were all female, spoke up specifically about UVM's perceived failures in addressing sexual assault on campus. "As a sexual assault survivor, I personally don't feel represented by the school at all," one speaker stated. "Before I was sexually assaulted, I didn't know where the Women's Center was," said another. "I didn't know what their services consisted of, I didn't know what would happen if I reported it." *Id.*

97.     The organizer of the event, who was working without the assistance of a student group, stated she "received assistance from staff at the women's center, including Campus Victim's Advocate Judy Rickstad, and other 'awesome women warriors.'" *Id.*

98.     Just a few months later, in August 2017, UVM again found itself in hot water with OCR after another student filed a complaint alleging that UVM "failed to respond promptly and equitably to [her] complaint of sexual violence by another student." This complaint launched OCR's second investigation at UVM.

99.     On information and belief, the OCR investigation was ongoing at all relevant times herein

100.    In September 2018, UVM was thrust into the spotlight once again, as a female UVM student launched a nationwide-wide lobbying campaign after allegedly being raped by a male UVM student, who was subsequently found not responsible by UVM's Title IX office. *See* Molly Walsh, *UVM Student Leads Effort to Require Colleges to Disclose Sexual Misconduct*, Seven Days (Sept. 28, 2018), https://www.sevendaysvt.com/OffMessage/archives/2018/09/28/uvm-student-leads-effort-to-require-colleges-to-disclose-sexual-misconduct.

101.    The student created a petition on the popular activism website Change.org calling for legislation that would require schools to place a notation on the transcript of any student who is found responsible for sexual misconduct. *Id.* The campaign became known as "Explain the Asterisk," and received over 50,000 signatures in support. The explanation for the campaign on the Change.org webpage focuses specifically on sexual assault statistics for college-age women.

102.    Discussing her Title IX case, the student founder of Explain the Asterisk expressly criticized UVM for permitting her accused to have an attorney (to which he is entitled under Title IX) and for daring to question her credibility as the accuser. *Id.*

103.    Notably, this article was published less than two weeks after Jane Roe's allegations against Plaintiff were converted into a formal Title IX complaint.

104.    While the Explain the Asterisk campaign was gaining nation-wide recognition and sparking on-campus events and participation, the UVM school newspaper published a piece criticizing the proposed new Title IX regulations and urging UVM to "side with victims, not assaulters." Lee Hughes, *New Sexual Misconduct Rules Leak*, Vermont Cynic (Sept. 5, 2018), https://vtcynic.com/news/new-sexual-misconduct-rules-leak/.

105.    Despite acknowledging that "[t]he motivation behind the changes is to hold schools to the idea of 'innocent until proven guilty,'" UVM student government chair Aidan Doherty argued, "[i]f you really break it down, it allows the university to do less work, it holds them to lower standards and it lets them get away with doing the bare minimum." *Id.* Doherty opined that the new regulations focused too much "on the legal proceedings" and did not sufficiently account for the "emotional toll of being assaulted." Doherty closed with an overarching challenge to UVM:

> This comes at a time when students strongly distrust and feel powerless before the university administration and government, and these rules would only make it worse . . . . This is just reinforcing that universities and the federal government don't care about [victims] and they're doing what they can to save their own ass . . . . That's a really scary feeling to feel helpless like that.

> *Id.*

106.    Just one month later, The Vermont Cynic published an opinion piece calling for complete intolerance of sexual misconduct—obviously, a laudable goal. However, the entirety of the article focused on male assailants and female victims. *See* Olivia Stafford, *Society Cannot Tolerate Sexual Misconduct*, Vermont Cynic (Oct. 18, 2018), https://vtcynic.com/opinion/society-cannot-tolerate-sexual-misconduct/.

107.    The author explained:

> *Women* fear for their safety when they walk alone at night. . . . *As women*, we are still held to unfair standards and our opinions are overlooked, but now is not the time to stop the fight. . . . *We* deserve to feel safe at college and we deserve the right to report sexual misconduct without fear. . . . [I]t is *our* responsibility to rise up and fight to progress the country into a place where *women are respected* and sexual misconduct is taken seriously.

> *Id.* (emphasis added).

108.    This intense pressure to side with female accusers and presume the guilt of the male accused intensified the next month, October 2018, the month in which Roe made her complaint

against Doe.  In the week leading up to the alleged incident, UVM students and faculty alike

protested the nomination of Brett Kavanaugh to the Supreme Court.  *See* Nicole Higgins DeSmet,

*UVM Students Organize Walk Out in Kavanaugh Protest*, Burlington Free Press (Oct. 4, 2018)

https://www.burlingtonfreepress.com/story/news/local/vermont/2018/10/04/uvm-vermont-

champlain-students-brett-kavanaugh-walkout-supreme-court-nomination/1519230002/.

109.    Nearly 1,000 students and faculty took part in the protest.  *Id.*  In addition, 150

UVM faculty members signed an open letter and call to action in support of Kavanaugh accuser,

Dr. Christine Blasey Ford, stating:

> We . . . write against the confirmation of Supreme Court nominee
> Brett Kavanaugh and against the *toxic conditions of gender*, sexual
> and racial inequality . . . . These are only the cases that were
> reported, just one indication of how a *nationwide culture of sexual
> predation* and violence pervades our own campus, dorms,
> classrooms, workplaces, and neighborhoods. . . . Of grave concern
> to us is the combined force of racism and *misogyny* . . . . We further
> *call on members of the University of Vermont community to stand
> with Dr. Ford and with survivors of sexual assault*, and we call on
> the UVM administration to increase prevention strategies to combat
> assault and *improve the humane and sensitive treatment of victims*
> who report sexual violence. With and beyond this letter, we commit
> our voices and our power to oppose the confirmation of Kavanaugh
> and to the multiple threats he represents . . . .

(emphasis added).

110.    One of the 150 faculty members who signed the open letter in support of Dr. Ford

was Professor Holly Busier.  As discussed in more detail below, Roe reported the alleged sexual

misconduct "around the time of the Kavanaugh hearing" to Professor Busier, but the mandated

reporter did not follow protocol and notify the Title IX Department, facilitate support for the

alleged complainant or initiate the appropriate institutional response.  Notably, Roe worried about

her lack of evidence to Professor Busier and likened her own situation to Dr. Ford's.

111.    In response to the Kavanaugh protests, UVM Communications Director Corredera stated, "These are important issues that we have been carefully and diligently working on for some time. We are continuously looking for opportunities to strengthen our strategies, and we will continue to do so." *Id.*

112.    These protests and the UVM community's calls for standing with—and most importantly, *not questioning*—female accusers, took place right before Roe's allegation launched UVM's investigation into her claims against Plaintiff. Indeed, Roe alleges the incident occurred on October 13, 2018, and Kavanaugh's confirmation hearing took place on or about September 28, 2018, until his confirmation on October 6, 2018.

113.    The pressure campaign continued into December 2018, when the Vermont Cynic published another opinion piece, this time demanding the complete exile from the society of men *accused of* sexual assault, regardless of whether or not they were found responsible/guilty by a neutral arbiter.    *See No Second Chances in MeToo*, Vermont Cynic (Dec. 12, 2018) https://vtcynic.com/opinion/no-second-chances-in-metoo/.    Once again, this article focused exclusively on women as victims/survivors and men as (alleged) assailants.

114.    The author declared:

> Hollywood actresses came together and spoke up about the abuse and power plays rampant in the industry, proving that even women who we perceive as more privileged are not safe. It was a venture into uncharted territory to see women advocate for themselves and others on issues that were previously swept under the rug. Now, we're seeing another new phenomenon: what happens when disgraced men decide it's their turn for a comeback. The main problem with the return of these individuals is that they — not the women they assaulted — are calling the shots on what they did and how they get to return. *When men get to draw the lines of what assault is and who the bad guys are, they draw it in their own favor.* . . . [A]s long as perpetrators are the ones making the rules, nothing will change because their versions of events are fundamentally different from the experiences of survivors. *When men see*

*themselves as the victims in the scenario, it is a problem because they were the perpetrators.* If we protect attackers instead of survivors, we actively perpetrate sexual assault. The bottom line is this: *if we let these men return to the spotlight, it will be as though the #MeToo movement never existed.* Once again, women will be silenced, powerful men will become invincible and survivors will be ignored.

115. Notably, the article designates sexual assault as exclusively a women's issue, despite the fact that (male) actor Terry Crews is widely acknowledged as "one of the most prominent male figures in the #MeToo movement." *See* Kashmira Gander, *'Brooklyn Nine-Nine' Actor Terry Crews: I Came Out as #MeToo Victim and 'My Life Was Turned Upside Down,'* Newsweek (Oct. 23, 2018), https://www.newsweek.com/brooklyn-nine-nine-actor-terry-crews-i-came-out-metoo-victim-and-my-life-was-1180791.

116. On the same day, the Cynic article was published calling for a permanent disenfranchisement of accused men, UVM Professor and Vermont State Education Committee Chair Philip Barith announced that he would be introducing Explain the Asterisk legislation in the Vermont state senate, to require universities to disclose findings of sexual misconduct on responsible students' transcripts. *See* Sawyer Loftus, *Student Campaign Inspires State Senator to Champion Assault Law,* Vermont Cynic (Dec. 12, 2018) https://vtcynic.com/news/student-campaign-inspires-state-senator-to-champion-assault-law/.

117. Barith threw his support behind the legislation despite public concerns that such legislation would create a de facto "sex offender registry" where the accused students did not have the concomitant constitutional protections to which criminal defendants are entitled. *See* Molly Walsh, *UVM Student Leads Effort to Require Colleges to Disclose Sexual Misconduct,* Seven Days (Sept. 28, 2018), https://www.sevendaysvt.com/OffMessage/archives/2018/09/28/uvm-student-leads-effort-to-require-colleges-to-disclose-sexual-misconduct.

118.     On January 2, 2019—just nine days before UVM investigator Spence conducted an initial interview of Doe in the instant case—UVM students again pressured the university to side with female accusers and impose harsh penalties against males accused of sexual assault. Responding to the proposed new Title IX regulations, UVM students claimed, "[t]hese new proposed changes are taking us back to the late eighties of how we used to handle sexual assault." Brandon Arcari and Sawyer Loftus, *New Federal Changes Could Force UVM to Change Sexual-Assault Policies*, Vermont Cynic (Jan. 2, 2019), https://vtcynic.com/news/new-federal-changes-could-force-uvm-to-change-sexual-assault-policies/.

119.     Students specifically rejected the notion of granting the accused a live hearing and permitting cross-examination of all witnesses, arguing such changes "are focused on protecting people who assault other people . . . . [I]t's honestly go[ing to] protect rich white boys who go to Ivy League schools." *Id.*

120.     One student, whose alleged assailant was found responsible by the Title IX office, opined, "I was really lucky, I had a very unique experience with the system . . . . But that's not an experience for a lot of survivors, and it's not a common experience at all. . . . I think there's a rape problem at UVM, I think there is a rape problem everywhere. . . ." *Id.*

121.     On January 30, 2019—as investigator McCarthy was taking over the investigation from her predecessor investigator Spence, after a bias complaint lodged against Spence—UVM issued its formal comments in opposition to the then-proposed Title IX regulations, discussed above.  Notably, the provisions UVM opposed most vehemently were the same provisions intended to provide due process, which UVM students had rejected in their comments to the Cynic just three weeks earlier.

122.    In March 2019—as McCarthy was getting around to completing her initial investigative report—the Vermont Cynic published yet another piece about women as victims of sexual assault, again calling for an unequivocal, unchallenged belief in all accusations of sexual misconduct. *See* Anna Power, *Ke$Ha's Story Highlights a Sad Truth*, Vermont Cynic (Mar. 18, 2019), https://vtcynic.com/culture/life/kehas-story-highlights-a-sad-truth/.  Notably, Roe attended a Ke$Ha-themed party with Doe the evening after the alleged encounter, where she ingested LSD.

123.    The article opens, "Many women in our society are subjected to physical, sexual and psychological abuse.  There were 27 reported rapes on campus in 2014. This is the highest that has been recorded in the previous two years, according to UVM's 2015 Annual Security report. . . .  Women are encouraged to speak up about these traumatic experiences, but their claims are sometimes denied and attributed as false." *Id.*

124.    Finally, on March 21, 2019—as the investigation into Roe's false allegations dragged on—the founder of the #MeToo movement, Tarana Burke, visited UVM, admonishing the administration: "I challenge you to think about how your work to prevent sexual violence on this campus is reflective of [UVM's] mission [statement] . . . . Do you have consistent, sustainable practices that actively work to meet the needs of the student body[?]" Maeve Gurnis, *"Me Too" Movement Founder Visits Campus for Diversity Symposium*, Vermont Cynic (Mar. 26, 2019), https://vtcynic.com/news/85641/.

125.    As one UVM faculty member described Burke's speech, "[w]e expected her to challenge us to be accountable, particularly in issues of sexual assault and sexual violence, and she did that." *Id.*

126.    Ms. Burke's visit was highlighted prominently on the UVM website, under the headline, *"Me Too" Founder Moves UVM to Its Feet:  Tarana Burke, founder of the "me too" movement, inspires urgency and accountability among UVM community.*

127.    Indeed, it seems that UVM accepted this challenge, and the years of mounting criticism and pressure from students, faculty, and the OCR to take a more heavy-handed, victim-centric approach that accepts female accusers' accounts at face value and banishes male respondents, when it unfairly and unjustly denied Plaintiff's appeal, suspending him from campus without significant, reliable evidence having been produced against him.

128.    On information and belief, UVM's history of complaints, OCR investigations, considerable bad press, and overwhelming student criticism regarding its perceived mishandling of claims of sexual misconduct committed by male students and faculty against female students—which continued through the time period of Roe's complaint against Plaintiff—placed extremely heavy pressure on UVM to "over-correct" by favoring protection of female students and finding male respondents guilty regardless of the facts of the case.

129.    On information and belief, years of pressure and internal-turned-national campaigns to advocate for victims, and specifically, to *believe all accusers without question*, and to banish men accused of misconduct regardless of actual guilt, created an institutional bias against males accused of sexual misconduct by females.

130.    On information and belief, this institutional bias against males accused of sexual misconduct infected UVM's processes and procedures specifically as applied to Plaintiff.

### D.  UVM's Commitment to Victim Advocacy, and Its Use of a Questionable and Biased Training Program.

131.    In addition to the internal, institutional pressure placed on UVM's Title IX office to believe female complainants and severely punish male respondents, UVM itself received

34

hundreds of thousands of federal dollars to create programs and initiatives specifically catered towards protecting female students.

132.    In 2000, UVM was among twenty institutions in the country to receive $300,000 in federal funding from the U.S. Department of Justice's Office on Violence Against Women (OVW) for the Campus Grant Program. *See Women's Center Earns Grant to Expand*, Vermont Cynic (Nov. 4, 2002), https://vtcynic.com/news/womens-center-earns-grant-to-expand/.    UVM continued to receive these massive grants in 2001 and 2002. *Id.*

133.    The purpose of these grants was to "help the Women's Center at the University of Vermont expand campus and community programs to reduce violent crimes *against women* on campus" and "to strengthen community response to violence *against women* through education and advocacy." *Id.* (emphasis added).  At the time of these grants, the Director of UVM's Women's Center stated, "many gender-related crimes are never reported. . . .  We expect the number of reported violent incidents to go up . . . as more *women* become aware that we offer a safe, reliable place and resources to meet *their* needs." *Id.* (emphasis added).  As the project director explained, "[o]ur goal is to create a campus culture that has zero tolerance of gender violence and that holds perpetrators responsible." *Id.*  Grant recipients, including UVM, were expected to increase the sheer number of sexual misconduct reports and sanctions for same.

134.    In 2006, UVM again received the OVW Campus Grant, for $200,000.

135.    In 2010, UVM again received the OVW Campus Grant, for over $100,000.

136.    According to the OVW, the purpose of the Campus Grant is to "reduce domestic violence, dating violence, sexual assault, and stalking by strengthening services to victims *and holding offenders accountable*." *See* Dep't of Justice, *About OVW Grants Programs*, https://www.justice.gov/ovw/grant-programs (emphasis added).

137.    The official description of the OVW Campus Program grant, which was authorized by the Violence Against Women Act, 42 U.S.C. § 14045(b) described the grant as "strengthen[ing] the response of institutions of higher education to the crimes of sexual assault, domestic violence, dating violence and stalking on campuses and enhance[ing] collaboration among campuses, local law enforcement, and victim advocacy organizations."  Dep't of Justice, *About OVW Grants Programs*, https://www.justice.gov/ovw/grant-programs.

138.    Specifically, the funding is intended to "support[] activities that develop and strengthen victim services and strategies to prevent, investigate, respond to and prosecute these crimes," by "develop[ing] and strengthen[ing] trauma-informed victim services and strategies," and requiring applicants to "establish an external partnership with at least one criminal justice system or civil legal assistance entity or organization such as external law enforcement agencies [or] prosecutor's offices."   Dep't of Justice, *Select Federal Agency Resources*, https://www.justice.gov/atj/select-federal-agency-resources   (emphasis   added); *see   also* https://www.justicegrants.info/GrantDetails.aspx?gid=39304.

139.    The program encourages grant recipients to "create or revitalize large-scale efforts that treat sexual assault, domestic violence, dating violence, and stalking as serious offenses by adopting effective policies and protocols, developing victim services and programs that prioritize victim safety, ensuring offender accountability, and implementing effective prevention approaches."  In that regard, "[c]olleges and universities should demonstrate to every student that these crimes will not be tolerated, *that perpetrators will face serious consequences*, and that holistic services are available for victims." (emphasis added).

140.    On information and belief, UVM was awarded the Campus Grants based upon its proof of compliance with the grant application requirements and program goals, as identified above.

141.    It is no surprise, therefore, that UVM's investigative procedures focus on victim advocacy, rather than impartial adjudication, including the single-investigator model and the absence of any live hearing or opportunity to test the accuser's credibility by cross-examination.

142.    The problems inherent to the single investigator model—bias, inaccuracy, and partiality—are further exacerbated by UVM's "trauma-informed" staff training program, which, upon information and belief, focused heavily on supporting accusers, bolstering their credibility, and ensuring that reports of sexual misconduct result in culpability and severe punishment for the male accused.

143.    On information and belief, UVM's Title IX training program is coordinated and/or conducted by Margolis Healy, a firm that specializes in campus compliance training.

144.    Indeed, one of the founders of Margolis Healy, Gary J. Margolis, was a former police chief at the University of Vermont, and UVM was recently contracted to help Margolis Healy roll out a massive new training initiative.

145.    Currently, Margolis Healy identifies Jes Kraus, UVM's Executive Director of Human Resource Services and Affirmative Action, as a Senior Consulting Associate for Margolis Healy.  On information and belief, Jes Kraus also has a background in law enforcement, much like investigator Emily McCarthy, who worked as a local prosecutor handling sexual assault cases prior to her employment with UVM and assignment to the instant matter.

146.    On information and belief, Margolis Healy trained UVM employees, including the named Defendants, utilizing a highly gender-biased model that urges investigators and

adjudicators to "start by believing" the female complainant, while actively questioning whether the accused male student is "who he said he is."

147.     On information and belief, Margolis Healy trained UVM employees, including the named Defendants, to view the evidence from the complainant's perspective, and to try to corroborate the complainant's allegations.

148.     On information and belief, Margolis Healy trained UVM employees, including the named Defendants, to "interrogate" the respondent, but to never interrogate the accuser.

149.     On information and belief, UVM's Title IX training instructed investigators to avoid "victim blaming" questions, such as questioning the complainant as to her own actions or involvement in the alleged incident.  On information and belief, the training further directed investigators to (i) use the terms "victim" or "survivor" in their investigation reports, rather than "accuser;" and not to use "alleged" before either of the former two terms, but conversely, to use "offender" rather than "respondent;" (ii) exclude from their reports anything indicating "consensual language" or "mutual participation" by the complainant; and (iii) avoid any statements that call into doubt a complainant's credibility, such as "victim has inconsistencies with her story" or "the victim's account of the incident is not believable or credible."

150.     On information and belief, this training relied heavily on a now-discredited study by David Lisak, wherein he concluded that "the vast majority of [campus] rapes are committed by serial, violent predators" and these serial rapists are largely undetected, leaving them free to rape again.  *See* David Lisak, *Repeat Rape and Multiple Offending Among Undetected Rapists*, 17 Violence and Victims 73 (2002).  Notably, the Lisak study focused entirely on male rapists, failing to even acknowledge that females can commit sexual assault.

151.    Similarly, on information and belief, the Margolis Healy training provided to UVM utilized examples that *exclusively* denoted victims as female and aggressors as males.

152.    Likewise, the OCR has expressly linked the trauma-informed approach to the protection of "girls and women." *See* Federal Partners Committee on Women and Trauma, *Trauma-Informed Approaches: Federal Activities and Initiatives* (Sept. 2013) at 17.

153.    According to the trauma-informed approach, a Title IX investigator who: (i) asks a complainant basic question, such as clarifying inconsistencies in her story or filling in gaps; (ii) observes the complainant's demeanor as part of a credibility assessment; or (iii) tries to "drill down on the details and establish a timeline of the night" is considered an "utter[] fail[ure]." *The 7 Deadly Sins of Title IX Investigations*, The 2016 ATIXA Whitepaper, at 2-3.

154.    The trauma-informed approach teaches investigators that "the brain responds to trauma by releasing chemicals into the body" that "can't be controlled" and "impact[] individuals' response to a perceived trauma at the moment and may corruptly recall of the event." *Id.* at 3. Further, the trauma-informed approach teaches investigators that "a triggering event (such as your interview) can reactivate this response." Accordingly, Title IX investigators employing a trauma-informed approach are instructed to: (i) ignore any inconsistencies or gaps in complainants' stories; and (ii) ask the complainant how she feels, rather than what happened. *Id.* at 4.

155.    Thus, investigators and adjudicators are taught in trauma-informed training that inconsistencies in a complainant's story are a direct result of the trauma. Similarly, they are trained to view those inconsistencies as a natural byproduct of assault as opposed to an indicator that the complainant's story may lack credibility.

156.    One of the major problems with the trauma-informed approach – aside from its blatant goal to specifically protect female complainants – is that it lacks solid scientific support.

*See* Emily Yoffe, *The Bad Science Behind Campus Response to Sexual Assault*, The Atlantic (Sept. 8, 2017).

157.    On information and belief, the individual Defendants received gender-biased, faulty training consistent with the aforementioned principles, and applied these questionable principles to the investigation and adjudication of Roe's complaint against Plaintiff in a manner that was designed to bolster Roe's credibility, even though major inconsistencies in her story pointed towards a lack of credibility, rather than to the occurrence of a trauma.

## II.    UVM'S BIASED, UNRELIABLE, FUNDAMENTALLY UNFAIR TITLE IX PROCESS.

### A.    **The Investigation Begins.**

158.    Plaintiff John Doe matriculated to UVM in August 2017 with an expected graduation date of May 2021. Jane Roe was also a freshman in August 2017.

159.    Doe and Roe met in sailing class during their sophomore year and became close friends.

160.    Doe was also close friends with Roe's "on-again, off-again" girlfriend Mary Koe[4] ("MK").

161.    In Fall 2018, the beginning of their sophomore year, Doe, Roe and a group of their friends planned to rent a house together for the following year: Fall 2019. Doe led the efforts to secure the house. He was successful in securing the home for the friend group for their junior year.

162.    On October 10, 2018, Doe's mother executed the lease as a guarantor. Plaintiff and Roe were excited to live together the following year.

---

[4] Mary Koe is being referred to pseudonymously herein.

163.    While the housing plans were coming together, Roe and MK struggled with their volatile romantic relationship, as MK was very controlling of Roe.  MK also regularly engaged in substance abuse and appeared generally disinterested in school.  The two were on a break around approximately October 11, 2018, immediately before the junior year housing was secured and shortly before the night of the alleged incident.

164.    Like Roe, Doe grew apart from MK in October 2018, likely because Doe advised Roe she should end her unhealthy, contentious relationship with MK.  Roe agreed that some space between her and MK would be healthy; she had been fighting with MK frequently.  As a result, MK was not invited to live in the junior year house with Doe, Roe and their mutual friends.

165.    Roe's friends voiced their concerns with her and MK's relationship privately.  Doe, however, was the only friend who discussed the issues with Roe, a sign of their close relationship.

166.    Doe's advice, and growing friendship with Roe, angered MK greatly.  MK became increasingly infuriated with Doe because of his growing bond with Roe, and the housing plans.

167.    As the junior year housing plans came together, and Roe's tumultuous relationship with MK unraveled, the UVM community was captivated by public discourse on sexual assault early in the Fall 2018 semester.

168.    Media coverage of the Kavanaugh confirmation hearing, the Explain the Asterisk campaign, and UVM's history of mishandling Title IX matters sparked significant student unrest at UVM.  Over 1,000 members of the UVM community protested the Kavanaugh appointment.

169.    Plaintiff and Roe, like many college students, drank alcohol and smoked marijuana often when socializing.  The night of October 12, 2018, was no different.  Roe invited Doe to her dorm room to "pre-game," a common reference to drinking alcohol before a house party, where more drinking and recreational drug use would often take place.

170.    Roe had three female guests visiting, staying in her dorm room on the night in question: her best friend from home, "Goalie," and two 17-year-old high school girls who were visiting Roe's roommate (three female guests collectively referred to as the "dorm guests").

171.    Prior to the house party, Doe, Roe, Goalie and at least one of the high school girls, drank alcohol, though not an excessive amount.

172.    At the party, Doe and Roe drank.  Neither appeared drunk to the point of slurred speech, unsteady gait or blacking out.  After the party, Roe, Doe and the dorm guests ate late-night pizza, and procured a ride to Roe's dorm room, upon Roe's invitation.

173.    When back at Roe's college dorm, she and Doe smoked "a bit" of marijuana from a joint provided by Goalie, who proceeded to smoke the majority of the joint.  Doe asked Roe if he could sleep in the dorm room with her, and the guests, to avoid the cold, late walk home.

174.    Roe agreed and offered Doe her roommate's lofted bed, but Goalie, a powerful, imposing figure claimed that bed for herself.  The two other guests slept on a nearby futon.

175.    Roe then invited Doe to sleep in her bed with her.  Doe stripped to his underwear and got into bed with Roe, who was wearing leggings.  The friends fell asleep together on the twin-size bed, with the dorm guests all sleeping a mere few feet away in the same room.

176.    Jane Roe was a heavier drinker than John Doe and she smoked more marijuana during their time at UVM.  Although Roe was far more likely to experience memory loss from substance abuse, the UVM investigators would later assume Doe, as the male student, was more likely to have a clouded recollection of the night in question.

177.    Doe, in fact, clearly recalled being woken up by Roe that evening.  The two slept in the spooning position, with Doe behind Roe.  Roe woke Doe up by grinding her buttocks against

his genitals. After Roe's grinding woke Doe, he placed his hand on her thigh first. Roe continued to grind on him slowly. Doe then touched Roe's genitalia.

178.   In response, Roe placed her hand on Doe's groin and rubbed her hand on his penis, voluntarily, over his underwear. Roe freely and voluntarily placed her hand into Doe's underpants. Doe did not guide Roe's hand. She continued to rub his penis until Doe ejaculated.

179.   At one point prior to climax, Doe heard one of the dorm guests rustle in the room. He put his hand on Roe's hand, to quiet the noise. Roe did not speak during this consensual sexual act. Doe advised Roe when he was going to "finish." Roe moaned in response and continued.

180.   After the brief consensual sexual encounter, both Doe and Roe fell back asleep.

181.   The next morning, as Doe, Roe and the dorm guests awoke, Roe offered Doe some water and they ate leftover pizza together. Roe drank a beer. She also invited Doe to join her on a hike later that day, but Plaintiff advised he had to study and complete some homework assignments. Doe and Roe planned to go out again that Saturday night.

182.   Later that day, October 13, 2018, Roe texted Doe to see if he was going to their mutual friend's Ke$ha-themed party. Roe invited Doe over her dorm room to "pre-game."

183.   Doe stopped by Roe's dorm room briefly and observed others drinking. Roe believed Doe "smirked" at her and stayed for "two minutes." Doe recalled staying for 10 minutes. He told Roe he was going to another party but would see her later at their friend's Ke$ha party.

184.   Doe arrived at the Ke$ha party after Roe, and he observed Roe "funnel"[5] multiple beers. He later joined Roe and Goalie on a couch upstairs to converse at the party. Roe informed Doe she and Goalie were "tripping" on LSD. After speaking with Roe and Goalie for a period of time, Doe wished them well then left the party shortly thereafter further conversation.

_____

[5] Funneling beers is a popular means of efficient binge drinking. Funneling entails utilizing a funnel and tube to drink the entire contents of the funnel, typically an entire 12-ounce beer at least, in a matter of seconds.

185.   Doe did not see Roe again that weekend.  Their next communication occurred on October 15, 2018, at approximately 8:57 a.m.  Doe sent a group text message to Roe and their friends to advise they were approved for the Fall 2019 house rental.

186.   Roe responded to the group text, at approximately 10:46 a.m., "Perfect. How do y'all want to pick rooms?"

187.   Later that day, at approximately 9:10 p.m., on October 15, 2018, Roe texted Doe to discuss their sexual encounter for the first time.  She asked Doe, "Do you remember Friday night at all?" To which Doe responded, "Kind of," via text message.

188.   Roe then texted Doe, "Do you remember me saying no"?  Doe responded, "No, I was in and out at that point."  Doe, recognizing the potential for misunderstanding in text message communications, then asked Roe if she would be willing to discuss the encounter in-person.  Roe refused because she was closing the gym.

189.   Roe attempted to explain the delay in making the allegation; she texted Doe, "Idk how I feel because I kinda let myself think about it fully without pushing it away for the first time today.  Thinking about it makes me upset but I don't want you to think I'm going to try to ruin your life over this."

190.   Roe continued, "I just didn't know if you remembered but I don't actually want to discuss the details."  Doe then attempted, multiple times, to meet with his close friend Roe to discuss the night in question.  Roe initially said she would meet up "eventually" to discuss the encounter, but they never spoke in-person again.

191.   The following morning, October 16, 2018, at 8:06 a.m., Roe texted Doe to advise she "had to tell [MK]."  Roe did not reveal when she told her overbearing ex-girlfriend.  Doe texted Roe four times throughout the day to ask her to talk in person about her concerns.

192.    Later that evening, at approximately 8:19 p.m. on October 16, MK ambushed Doe after he was lured outside of his friend's dorm room by a mutual friend.  MK yelled at Doe violently, berated him for approximately ten minutes and threatened him with physical harm.  MK would soon reveal that she was the driving force behind Roe's Title IX report to UVM.

193.    Following this behavior, at 10:52 p.m., MK sent Doe an ominous, prophetic warning via text message, "next year if you are still in attendance at this university there is absolutely no way you will be living at [the house Doe, Roe and friends had just secured]."

194.    The text from MK evinced malicious motivation and her recognition that a Title IX complaint could be utilized to foil Doe and Roe's plans to live together the following year, without MK.  Roe's excluding MK from the house, and Doe's advising his friend Roe to maintain space from MK, rendered Doe an enemy of MK, and a threat to her desire to control Roe.  The Title IX investigators would later ignore the evidence of this dynamic.

195.    Over the next week, Plaintiff received a number of text messages on the group message, including texts from Roe.  The text messages were regarding housing the following year.

196.    On October 23, 2018, approximately one week after MK sent Doe a text threatening removal from UVM, Roe submitted an online reporting complaint form to UVM's Title IX office.

197.    On October 24, 2018, UVM Outreach Coordinator, Taryn Moran, sent an email to Roe to provide reporting options.

198.    On October 25, 2018, Roe, in a clear attempt to manufacture evidence to support her claims, texted Doe and demanded he admit he remembered hearing her saying "no," or "No [MK]."  Plaintiff explicitly denied Roe's claims.  He had a clear recollection of the night, the proximity of the three dorm guests, and Roe's unprompted, consensual contact with his genitalia.

199.     While Doe and Roe communicated, MK was texting threats to harass Doe.  In some instances, Doe received texts from Roe and MK simultaneously.

200.     Roe responded, "No you heard me because you responded and you stopped touching me."

201.     On October 29, 2018, Roe texted Doe and advised they both could not live in the house he secured for them for Fall 2019.  That same day, Doe texted the group of friends to advise he would leave the lease once they found a guarantor to replace his mother, which he did.

202.     On November 8, 2018, Roe met with Taryn Moran, the outreach coordinator.  Roe stated she discussed her complaint with her professor, UVM's Holly Busier, prior to filing it with the school on October 23, 2018.  Notably, Professor Busier never filed a report with the school.

203.     Upon information and belief, Busier and Roe discussed Roe's lack of evidence in support of her allegations.  Busier noted Roe's evidentiary issues were similar to Dr. Ford's allegations against Kavanaugh.  Absent evidence, Roe and her professor concluded, the allegations would be difficult to prove because it would be a case of "he said, she said."

204.     Roe would later produce, as evidence of corroboration, two loose pages of an alleged journal entry dated October 15, 2018, that Roe purportedly made in a journal that was not produced.  The journal entry included a new, more serious, allegation that she woke up with Doe digitally penetrating her.

205.     Busier was subsequently interviewed regarding Roe's statement, by some unknown UVM agent at some unknown time.  According to Busier, the conversation occurred because Roe requested an extension on her coursework, and, Busier further recalled, occurred "around the time" of the Kavanaugh hearing.

206.    Upon information and belief, there were no ramifications for Busier's failure to report the sexual misconduct in accordance with the Policy. The Title IX investigators did not consider the professor's policy violation, or the troubling discussion regarding the need for more evidence, in their assessment of Roe's allegations, credibility or evidence.

207.    Justice Kavanaugh was confirmed on October 6, 2018. The protests at UVM occurred the same week. Busier met with Roe sometime between October 13, 2018, and October 23, 2018, when the subject complaint was filed.

208.    Most troublingly, despite the investigators' knowledge of the above meeting between Roe and Busier, they accepted, without question, Roe's alleged journal pages as genuine.

209.    On or about December 3, 2018, Plaintiff received a letter from investigator Kate Spence ("Spence") of UVM's Office of Affirmative Action and Equal Opportunity (AAEO), UVM's Title IX office. Spence notified Doe that AAEO received the complaint from Roe alleging he engaged in conduct that may be a violation of the Sexual Assault or Sexual Exploitation provisions of UVM Policy V. 7.11.2: Sexual Harassment & Misconduct.

.210.    Roe alleged Plaintiff engaged in non-consensual sexual contact with her in her dorm room. Specifically, she alleged Plaintiff, without consent, touched Roe's labia and external vaginal area with his fingers, penetrated her vagina with his fingers and placed her hand on his naked penis to provide sexual stimulation.

211.    The letter from Spence contained a No Contact Order and directed Doe to contact her for an interview. The same day the letter was sent, December 3, 2018, Roe met with Spence.

212.    Plaintiff contacted Spence to schedule an interview in response to her letter. He was able to schedule the interview for January, to avoid interference with final exams in December.

213.    On December 11, 2018, Doe emailed Spence a retaliation complaint against MK. Doe reported MK, on two separate incidents, threatened to physically harm him.  In the first instance, she threatened Doe in his dorm room.  In the second instance, MK approached Doe in the library and threatened to give him "a black eye."

214.    On December 15, 2018, Doe was ordered to vacate his dorm, though no finding of wrongdoing had been reached at that point in time.

215.    Doe appeared for his initial interview with Spence on January 11, 2019.  From the moment he entered the interview, Spence conducted herself in an adversarial, confrontational manner.  Doe was presumed guilty, and Spence's vitriol was palpable.

216.    Spence demanded Plaintiff turn over his cell phone and warned a refusal to do so "would diminish his credibility."  Spence then had Doe draw a diagram of the layout of Roe's dorm room and draw a map of the route the group took to return to campus on the night of the alleged incident.

217.    Upon information and belief, Roe was not required to turn over her phone under threat of diminished credibility.  Roe was not required to draw a diagram or map either.

218.    Plaintiff, after turning over text messages to Spence, made a formal request to have Spence removed due to her aggressive, confrontational intimidation tactics and obvious bias.

219.    Prior to her removal, Spence took the retaliation report against MK but did not investigate the complaint seriously.  Doe emailed Spence the initial retaliation complaint on December 11, 2018, but when he met with Spence for his initial interview on January 11, 2019, the investigator admitted she had not yet reviewed his complaint.  Though an NCO was issued against MK, the nominal punishment against MK amounted to no more than a meaningless homework assignment.  MK was required to write a two-page essay on her "purpose" at UVM.

220.     Plaintiff had momentary hope when, in late January, he was advised that a new investigator would be assigned by AAEO.  Investigator Emily McCarthy ("McCarthy") notified Doe that she would be the new Title IX investigator on January 31, 2019.  The moment of optimism was brief, however, as McCarthy exhibited the same biases and blind loyalty to the female "victim" as her predecessor and UVM, in general.

**B.   <u>New Investigator, Same Bias: Emily McCarthy Carries the Torch of Injustice</u>**

221.     Prior to her employment as Title IX Investigator at UVM, McCarthy prosecuted domestic violence and sexual assault cases as a Deputy State's Attorney in Chittenden County.

222.     McCarthy reprised her prosecutorial role in the instant matter, as she represented the interests of the alleged victim, in a manner clearly adversarial to Doe.

223.     In support of her efforts to convict Doe with a finding of responsibility, McCarthy ignored inconsistencies within Roe's stories, employed leading questions with Roe seeking confirmation of proposed "facts," and ignored the preponderance of the evidence standard.

224.     On February 21, 2019, Plaintiff appeared for his initial meeting with McCarthy, who admitted she had not read any case files prior to interviewing him.  McCarthy's lack of interest in Doe's evidence, explanations and recollection of the encounter continued throughout the entire investigation.  Conversely, *she spoke with Roe approximately ten (10) times to discuss her complaint, while Doe only spoke to McCarthy twice*.  When Doe asked McCarthy about the disparity in meetings, she simply did not respond.

225.     McCarthy accepted Roe's complaint as true.  She did not question the complainant critically, probe her for details or in any way doubt Roe's inconsistent claims or evidence of corroboration between Roe and her witnesses.  Any inconsistencies were either ignored by McCarthy or, worse, cited as corroboration to lend credibility to Roe, defying logic.

226.   McCarthy found no issue with the inconsistencies in Roe's various recounting of the encounter, or the fact that none of the three other dorm guests sleeping feet away in the cramped room heard Roe's various protests.   At different points in the process, Roe's recollection of her protests changed from "No, [MK] would hate us", to "No, [MK] would never forgive us" to "No, [MK], I'm [Roe], I'm with [MK].  You love [MK].  I love [MK]."

227.   In the face of substantial evidence that directly contradicted Roe's claims, and the varying versions of Roe's alleged revocation of consent, McCarthy wrote in her investigation report, "If Complainant had written that she simply said 'no' it would have had the same effect, but the detail and uniqueness of the statement enhances the credibility of Complainant's statement that she said this to Respondent when he first touched her waistband."

228.   The investigators never questioned Roe about the fact she and MK were on a break during the time of the encounter, or her and Doe's decision to live together without MK or MK's threatening Doe with violence and his removal from UVM prior to Roe's reporting the allegations.

229.   McCarthy proceeded in a gender-biased manner for the entirety of the investigation: ignoring evidence that favored Doe, focusing on corroborating Roe's claims, discounting or excluding any evidence, questions or witnesses that tended to impeach Roe, and casting unnecessary aspersion and baseless negative inferences on Plaintiff and his witnesses.  By way of example, and without limitation:

a.   In her final investigation report, McCarthy chose only Roe's statements to list as "facts" when laying out her findings.  She listed the aforementioned variations of "no" by Roe as factual but failed to note Doe's claim that nobody spoke during the encounter or mentioning the three other people in the small room heard nothing.

b.  McCarthy consistently led the witnesses' responses during questioning.   In particular, McCarthy employed leading questions with Roe, asking for her confirmation of facts rather than requiring that she provide the information.  She also failed to critically question Roe at any point about her potential evidence tampering, with Busier or her friends, or about MK's role in her making the complaint.   Alternatively, any slight deviation in Doe's recall of events was used to claim it severely diminished his credibility in the investigator's eyes.

c.  McCarthy did not allow Doe, or his witnesses, to review her written summaries of their interviews for verification and accuracy or to confirm, clarify or make corrections to her summaries.  Further, Doe submitted questions to McCarthy to clarify key points, but she determined all of Doe's questions were irrelevant and disregarded same.

d.  McCarthy, and before her, Spence, accepted Roe's self-serving journal entry as completely legitimate as to the date, October 15, 2018, and substance, alleging she told Doe "No [MK] would hate us," or "No [MK] would never forgive us," then subsequently woke up with Doe's digitally penetrating Roe.  McCarthy accepted the two pages as legitimate entries in a journal, failed to account for the fact that this journal entry could have been created another time or as a means of bolstering an otherwise "he said, she said" accusation after Roe's discussion with Busier.  Indeed, the journal entry might not have been a journal entry at all, but simply the necessary "contemporaneous" notes created to bolster the allegation.

e.  The investigators ignored the fact that Roe did, after all, speak to Professor Busier prior to drafting this journal entry while commiserating over Roe and Dr. Ford's 'unfortunate' lack of evidence.   Professor Busier, without the following protocol and reporting the allegation, advised Roe that the case would be difficult to prove without such further evidence.  The investigators obviously felt no need to examine the "journal," or even compare the two ripped pages with random journal entries for consistency.

f.  The investigators' bias clouded their judgment as they overlooked obvious credibility issues ranging from the aforementioned journal entry's legitimacy, to Roe's evolving allegations from initial report to investigation, to Roe's conduct the day after the sexual encounter which belies her claimed lack of consent including but not limited to: Roe's omission of her voluntarily manually stroking Doe's penis to completion, Roe's inviting Doe on a hike, pre-party and a Ke$ha-themed party the evening after the sexual encounter, as well as evidence of Roe's attempts to create favorable evidence and coordinate her story with witnesses in light of her conversation with Professor Busier.

g.  Indeed, McCarthy failed to inquire about Roe's conversations with her witnesses prior to their interviews, despite the fact Roe's witnesses were all admittedly aware of the allegations from said conversations. More importantly, McCarthy inexplicably disregarded a text message between Roe and a friend, AM, in which they coordinated their stories for the investigator.

h.  McCarthy refused to ask witnesses questions that could hurt Roe's credibility. Prior to the alleged incident, Roe was known as someone who drank an

excessive amount of alcohol, smoked marijuana often and experimented with other drugs, such as LSD.   The investigator would later ignore the complainant's history of binge drinking and recreational drug use experimentation, when she inexplicably deemed Roe to have the clearer recollection of the evening in question under the assumption Doe was more intoxicated because he was male. The sanctioning panel also accepted Roe's claim to wrongfully attribute Roe's claim that her intoxication and experimentation increased due to the alleged assault, as opposed to Roe's pre-existing affinity for intoxicants.

i.   Conversely, as McCarthy looked away from Roe's less wholesome qualities, she excitedly included every negative rumor or hearsay she could against Doe in her report, including irrelevant relationships with other women, or Doe's getting tested for an STI, to impeach his character.

j.   The investigators did not consider Roe's claims objectively; they failed to question complainant on how or why the dorm guests, laying feet away from her and Doe, did not wake up or why Roe did not wake her friend, the powerful, imposing "Goalie" if Doe was assaulting her.  They also failed to investigate the obvious potential for MK's forcing Roe to fabricate claims against Doe, given the overbearing ex-girlfriend's exclusion from the friends' junior year housing and the documented threats by MK to Doe.

k.   Roe provided inconsistent, contradictory statements with regard to key points such as her consent and penetration.  She notably failed to mention her stroking Doe's penis voluntarily, in her alleged journal and initial reporting of the

encounter, then provided unconvincing explanations to qualify the manual stimulation as involuntary.

l. McCarthy identified and ignored two discrepancies: (1) Roe's varying accounts of when, and if, Doe's digitally penetrated her vaginally and (2) the aforementioned omission of initiating sexual contact by her hand rubbing Doe's penis. Roe was inconsistent in describing when, and if, Doe digitally penetrated her in her reports, written statements and interviews. In an earlier telling, she stated Doe touched her vulva, then she touched his penis prior to his digitally penetrating her. Later, in her alleged journal entry, Roe alleges she woke up to his fingers already inserted but omits her touching Doe's penis. Conversely, in a March 1, 2019, interview, Roe stated she woke up as Doe was touching her vulva, but his fingers were not inside her vaginal opening. She also told Professor Holly Busier that she was "groped." Despite the noted inconsistencies, McCarthy wrote, in her report, "This imprecision does not detract from the credibility of her statement to AAEO."

m. Roe failed to acknowledge her grinding her buttocks against Doe prior to his touching her thigh and, eventually, vulva. She also failed to disclose that she provided sexual stimulation to Doe by touching his penis in her initial reporting form to AAEO, her disclosure to their mutual friends or in her alleged journal entry, which McCarthy relied upon heavily in her determination. McCarthy notes the "omission reflects on the credibility of her statement because it reflects on whether the contact was consensual," yet, the biased investigator reaches the illogical conclusion, "this evidence—which is potentially an

indicator of consent—occurred after Respondent initially touched Complainant's vulva. Given this, the taint of the effect of the [Complainant's] omission is minimized."

230. McCarthy presumed Roe to be credible and overlooked the aforementioned inconsistencies, and unreasonable claims, as mere insignificant imprecision. Conversely, Doe, who was entitled to a presumption of innocence, was consistently treated as guilty and dishonest. From the moment he was required to provide his text messages, until the below findings were issued, Doe was presumed guilty.

## C. **The Findings.**

231. On May 13, 2019, McCarthy issued a Final Report finding Plaintiff responsible for two acts of Sexual Exploitation and one act of Sexual Assault in violation of UVM Policy 7.11.2, Sexual Harassment and Misconduct.

232. McCarthy concluded there was sufficient evidence to conclude Doe violated the Sexual Exploitation provision of the Policy by (1) touching Roe's vulva without her consent and (2) by placing Roe's hand on his penis without her consent. The investigator further concluded there was sufficient evidence to conclude Doe violated the Sexual Assault provision of the policy by digitally penetrating Roe without her consent.

233. Without legitimate justification, McCarthy deemed Roe to be more credible than Doe. The investigator relied on the journal entry claiming it enhanced Roe's statement's inherent reliability. She then noted several factors that did not enhance, nor detract from Roe's credibility, including Roe's inconsistent description of Doe's digital penetration, Roe's omission of the fact she touched Doe's penis and her group texts about living with Doe.

234.     McCarthy failed to mention Professor Holly Busier in her report, much like she failed to meaningfully investigate the Professor's role in this matter, despite Plaintiff's request for the investigator to do so.  Professor Busier, a signatory on the letter in support of all survivors of sexual assault and Dr. Christine Blasey Ford, was one of the first people whom Roe discussed her allegations in October.

235.     Busier was eventually interviewed in January 2019 and told McCarthy about her discussion with Roe.  Roe told Busier she "was worried that she did not have a lot of evidence and worried that people would not believe her as seen with the Kavanaugh hearings."  McCarthy remained unbothered by the fact the complainant openly worried about her lack of evidence, then manufactured supporting evidence in a self-serving "journal entry," some text messages sent for the purpose of goading Doe into an admission, as described above, and conspiring to manufacture witness corroboration with her friends, whom she spoke with prior to their interviews in order to coordinate their stories.

236.     The investigators' ignoring the aforementioned troubling evidence of witness and evidence tampering and the general unwillingness to objectively assess Roe's questionable allegations, inconsistencies and motives, amounted to an unfair process, in which Doe's conviction was assured.  The blatant favoritism reeks of bias and is the precise dynamic that has led to prohibition of the single-investigator model in the August 2020 Title IX Final Rule.

237.     Doe was found responsible without the benefit of a hearing, the ability to cross-examine complainant or her friend-witnesses or the semblance of a credibility assessment of his accusers.

238.    After McCarthy found Plaintiff responsible for Sexual Exploitation and Sexual Assault, Plaintiff was then required to move forward with the sanctioning process, without the ability to challenge the unfounded and erroneous findings or the bias that contributed to same.

### D.  **The Sanction Hearing.**

239.    On May 15, 2019, Plaintiff received a notice to attend a meeting with the Center for Student Conduct to discuss the sanction hearing process.

240.    On June 5, 2019, Plaintiff attended the Sanctioning Hearing.  Roe, again, did not attend the hearing, in person or even remotely, so there was never a live assessment of her credibility at any point in this proceeding.  The panel was not able to ask questions to assess the truthfulness or severity of the impact claimed by Roe.  The hearing chair read a statement from Roe in which she claimed to have suffered from a list of detrimental effects as a result of the alleged incident.  No supporting documentation was provided to verify Roe's claims.  Nonetheless, the panel used the unsupported statement, where Roe claimed to feel unsafe on campus, as an aggravating factor to remove Doe from UVM's campus.  Roe's opening statement contained new, outrageous, uncorroborated information designed solely to maximize the sanctions for Doe.  Roe claimed, for the first time, that the incident was premeditated, she could no longer participate in softball and felt unsafe on campus.  These new claims were, again, made without support, but accepted as true by the biased panel.

241.    The hearing format, with an inability to cross-examine the key complaining witness, was inherently unjust, biased and lacking in due process.  This hearing for Doe, however, was particularly unjust.  He had prior dealings with Defendant Anna Epshteyn, the hearing chair, and her disdain for Doe was apparent to all in the room.

242.    Epshteyn also presided over Doe's retaliation complaint against MK and was clearly sympathetic to MK.  MK was found responsible for retaliation as she threatened to harm Doe, a serious infraction; however, the sanction she received was a slap-on-the-wrist homework assignment, to write a two-page essay on "her purpose" at UVM.

243.    Epshteyn also previously served as chair of a hearing in which Plaintiff was alleged to have been smoking a "joint" on campus on April 20, 2019.  In that hearing, Epshteyn was unabashedly dismissive of Doe, who defended himself zealously against the charges.

244.    At the time of the sanctioning hearing, Epshteyn possessed a blatant, personal animus toward Doe.  This biased, unjust, and partial voting chair should have recused herself from the Title IX proceeding, but instead, participated in a manner detrimental to Plaintiff.

245.    During the hearing, Epshteyn was outwardly hostile towards Doe.  She asked the student if he had attended his extensive therapy and counseling sessions for his benefit "only?"  The insensitive remark speaks volumes about Epshteyn's decorum, lack of empathy and cold insensitivity, as she dismissed Doe's mental health struggles in front of all the panel members.  Further, when Doe asked her if the panel decision had to be unanimous or majority, Epshteyn arrogantly barked, it "would be unanimous.  It's been that way 99% of the time since I have been doing this."  The implication was clear: the unanimous decision against Doe was already assured.

246.    In addition to the improper reliance on Roe's letter, read by Epshteyn, the panel also wrongly considered Doe's "past drug violations."  The sole infraction was the aforementioned single marijuana/joint violation which Epshteyn presided over in 2019.  Epshteyn was the hearing chair for that allegation as well.  She was clearly prejudiced towards Plaintiff as evidenced by her demeaning tone, language, and manner toward Doe.

247.    On June 13, 2019, Plaintiff received notice of his sanction.  The panel permanently dismissed Doe from UVM.

248.    According to the Sanction letter, the Sanctioning Panel found the intensive treatment Epshteyn mocked to be a mitigating factor.  The aforementioned mistaken "past drug violations," and Roe's alleged feeling "unsafe," were improperly considered as aggravating factors.

249.    The June 13, 2019, Outcome Letter from Epshteyn was a lengthy summary of what was stated during the hearing, however, it lacked analysis of how the sanction of dismissal was determined. Epshteyn merely wrote, "Ultimately, after weighing the serious nature of the incident, the severity of the impact of your conduct and the mitigating and aggravating circumstances presented, the Sanctioning panel concluded that dismissal is the only appropriate sanction."

**E.  Plaintiff's Appeal.**

250.    On June 28, 2019, Plaintiff submitted an appeal of both the Finding and the Sanction to UVM's Student Conduct Appeals Officer, and long-time in-house counsel, Defendant Thomas Mercurio.

251.    In his appeal, Plaintiff noted the blatant procedural and substantive errors in the investigation and fact-finding process, including McCarthy's intentional disregard for objective evidence discrediting Roe and tending to exculpate Plaintiff, citing McCarthy's bias as a reason.

252.    Plaintiff also argued the biased sanctioning panel chair, Epshteyn, should have recused herself.  He argued the sanctioning panel abused its discretion in various ways, including by dismissing Doe permanently from UVM without providing appropriate reasoning/justification.

253.    On July 26, 2019, Mercurio denied Plaintiff's appeal in part but granted the appeal with regard to the expulsion.

254.    Mercurio stated he was unable to decipher the panel's rationale for imposing the harshest possible sanction, dismissal/expulsion, as opposed to suspension or other lesser sanctions. He wrote, "the behavior in which you engaged does not appear to fall within the range of seriousness that would warrant permanent dismissal," and, after the expulsion was overruled, UVM's former counsel concluded the behavior was, "well within the range that would warrant a suspension. Considering the impact on the young woman, I conclude a one-year suspension is more fitting than one semester."

255.    In language honed from decades of work as UVM's legal counsel, Mercurio rejected the remainder of Plaintiff's arguments and refused to question the spurious credibility assessments and blatant bias portrayed by the investigator or any other substantive arguments regarding the sufficiency of evidence. The appeal was not an objective assessment of the insufficient investigation and proceeding as much as a protection against future litigation.

256.    Acknowledging—and immediately dismissing—the legitimate concerns of bias on the part of the investigators, Mercurio refused to question the investigatory choices of McCarthy or Spence. He highlighted the "seven-month process and detailed investigation report" as evidence of the legitimacy of the investigation. Mercurio ignored the delay in what is supposed to be a prompt investigation. Mercurio failed to consider whether his colleagues were gender biased. He merely concluded Doe's accusations of bias and prejudgment were conclusory. While Doe presented evidence to point to reasonable inferences of bias, the former general counsel provided no support for his rejected and made no attempt to defend the investigators' questionable choices.

257.    Mercurio's adversarial and sarcastic tone permeated the appeal denial letter, including such inappropriate comments as "I find it puzzling how [Spence's] demeanor at your initial interview presents a basis for appeal." Mercurio failed to see any issue with an investigator who attempted to force Plaintiff to turn over his cell phone under threat of diminished credibility, especially considering UVM removed the initial investigator for bias, yet still utilized Spence's work product to that point. Similarly, Mercurio asserted his review of the record does not reveal an abuse of discretion, despite his concession the expulsion should be reduced to a suspension.

258.    With respect to Plaintiff's appeal of his sanction, though Mercurio's reduction to a one-year suspension was certainly an improvement over permanent dismissal, the sanction remains unjust for all the reasons stated herein. The bias of the investigators and sanctioning panel, use of the single investigator model and the lack of cross-examination of Roe and her witnesses render the proceedings unconstitutional and in violation of Title IX. Plaintiff was deprived of his right to due process, and a fair, impartial proceeding in which he could defend his reputation, good name and future. The unjust proceeding resulted in an erroneous outcome finding Doe responsible.

259.    With his appeal denied, and a one-year suspension in effect, Plaintiff has exhausted all potential remedies under the school policies and procedures. The instant lawsuit represents his last chance to clear his name and right the wrongs occasioned by Roe and Defendants' conduct.

## III.    AGREEMENTS, REPRESENTATIONS, COVENANTS & WARRANTIES BETWEEN PLAINTIFF AND DEFENDANT UVM

260.    Upon Plaintiff's acceptance into UVM, Defendant UVM provided Plaintiff with a digital copy of, and/or access to, the Sexual Harassment and Misconduct Policy ("the Policy"), which contained UVM's procedures for the investigation, discipline, and resolution procedures of

sex-based complaints.  Plaintiff was also required to complete an online course regarding sexual misconduct.

261.    On information and belief, the Policy was last updated in August 2016.

262.    The Policy and all other policies and procedures incorporated herein by reference represent express promises made to students regarding the investigation and adjudication of sexual misconduct complaints, which terms become part of the contract between the students and the school, and specifically, between Plaintiff and UVM.

263.    According to the Policy, "[w]hen a report is made to AAEO by a Complainant, or an investigation is otherwise initiated by the University, AAEO will conduct a *thorough, prompt, and impartial* investigation and generate a report which includes a determination of whether or not the Respondent violated this and/or other related University policies, *based on a preponderance of the evidence standard . . . .*"  Policy at 12 (emphasis added).

264.    According to the Policy, the entire investigation and adjudication process is to be "guided by the principles of fairness and respect for Complainants and Respondents."  Policy at 13.

265.    According to the Policy, the investigation and adjudication process must proceed in accordance with the Procedural Guidelines for Handling and Resolving Discrimination Complaints ("Complaint Procedures").

266.    According to the Complaint Procedures, UVM's investigative and adjudicative process is designed to "consider the rights of both parties, . . . and applicable laws" and to be "fair, impartial, and equitable . . . with thoroughness and respect for all parties."  Complaint Procedures at 1.

267.    According to the Policy, "[t]he evidentiary standard used in campus investigation and disciplinary processes to determine whether or not a Respondent is responsible for a violation

of this Policy" is a preponderance of the evidence.  "A preponderance of the evidence is found when the alleged actions are more likely to have occurred than not."  Policy at 5.

268.   The Complaint Procedures clarify the preponderance of the evidence standard as "requir[ing] that the evidence supporting each finding be more convincing than the evidence in opposition to it."  Complaint Procedures at 2.

269.   Once an investigation is underway, "the decision to interview particular witnesses, allow or consider evidence offered by the parties, or determine which written questions are appropriate to the case and therefore, which questions ultimately will be asked, is within the sole discretion and professional judgment of the Investigator."   Complaint Procedures at 4.   The Complaint procedures expressly preclude the cross-examination of the parties.  *Id.* at 5.

270.   If a Respondent is found responsible for a policy violation, the Policy provides that sanctioning will be guided by the Sanctioning Procedures for Student Respondents Under UVM's Sexual Harassment & Misconduct Policy ("Sanction Procedures").

271.   According to the Sanction Procedures, "the sanctions issued will be commensurate with the nature and severity of violation(s) found to have occurred by a preponderance of the evidence."

272.   The Sanction Procedures also set forth specific aggravating and mitigating factors to be considered.  Mitigating factors include:

   a.   "Has the Respondent taken steps to positively address their behavior, or otherwise educate themselves on issues of sexual harassment and misconduct, including consent or other items directly related to the incident(s)? Note: the Sanctioning Panel recognizes the parties have a right to appeal the investigation

outcome; Respondent's disagreement with a finding of responsibility does not constitute an aggravating circumstance;" and

b. "Did the Respondent exhibit a significant amount of cooperation with the University and/or public officials responding to the incident? Note: the Sanctioning Panel recognizes the parties have the option not to participate in the University process; Respondent's non-participation does not constitute an aggravating circumstance."

273.    Once a sanction decision is issued, the Policy provides for appeals on the following grounds: "1) a procedural error unfairly and materially affected the outcome of the case; 2) material evidence has been discovered that was not reasonably available at the time of the investigation or sanctioning determination, or 3) there was a clear abuse of discretion on the part of the Investigator or Sanctioning Panel." Policy at 13.

274.    In the instant case, UVM violated numerous provisions of its policies and procedures for adjudication sexual misconduct claims, including:

a. Failure to conduct a fair, impartial, equitable and thorough investigation;

b. Failure to abide by principles of fairness;

c. Failure to respect the rights of the parties, specifically, Plaintiff as the male respondent, including a failure to maintain confidentiality or punish retaliation on the part;

d. Failure to apply the preponderance of the evidence standard;

e. Failure to impose sanctions "commensurate with the nature and severity of the violation(s) found to have occurred by a preponderance of the evidence;"

64

f.  Failure to acknowledge and properly weigh the relevant mitigating and aggravating factors; and

g.  Failure to give due and proper consideration for Plaintiff's appeal, which provided ample evidence for reversal based upon the stated grounds for appeal.

## IV.    PLAINTIFF'S DAMAGES.

275.    As a result of UVM's unlawful, improper, gender-biased disciplinary process, Plaintiff was deprived of due process and subjected to an erroneous outcome, including an unwarranted expulsion, then suspension, precluding him from receiving the education he was promised by virtue of his enrollment at UVM.

276.    As a result of Defendants' unlawful and improper actions, Plaintiff's education and career path have been derailed, resulting in considerable economic and other harm.

277.    As a result of Defendants' biased, unlawful, and improper conduct, Plaintiff was treated as a perpetrator and presumed guilty from the start.

278.    As a result of Defendants' biased, unlawful, and improper conduct, Plaintiff has been falsely labeled as a perpetrator of sexual assault, an unjust, defamatory classification that will prove impossible to undo in certain circles, including circles Plaintiff aspires to join in his future educational and career endeavors.

279.    As a result of Defendants' biased, unlawful, negligent, and improper conduct, Plaintiff's transcript and academic/disciplinary file are now marred by a false and baseless finding of sexual assault, sexual exploitation and a suspension for same.

280.    As a result of Defendants' biased, unlawful, negligent and improper conduct, Plaintiff has suffered and will continue to suffer mental pain and anguish, emotional distress,

reputational harm, deprivation of his education and damage to his future educational and career prospects.

## AS AND FOR A FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983: Denial of Fourteenth Amendment Due Process
### (Against All Defendants)

281.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

282.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law." A similar right is stated in the Fifth Amendment to the United States Constitution.

283.    42 U.S.C. § 1983 provides, in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

284.    Public university students, including Plaintiff John Doe, have a protected property interest in their continued education, of which they cannot be deprived without due process. See, e.g., *Merrow v. Goldberg*, 672 F. Supp. 766, 771 (D. Vt. 1987) ("public college and university graduates have protected property interests in their degrees.").

285.    Public university students also have a protected liberty interest in their future educational and employment opportunities and occupational liberty, of which they cannot be deprived without due process.

286.    John Doe's constitutionally protected property and liberty interests in his continued enrollment at UVM, and to be free from arbitrary suspension, also arise from the policies, courses of conduct, practices, and understandings established by UVM.

287.    John Doe's constitutionally protected property and liberty interests similarly arise from the express and implied a contractual relationship between UVM and John Doe.

288.    It is well established that the Fourteenth Amendment due process protections are required in higher education disciplinary proceedings.

289.    A person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process.

290.    As a result, if John Doe as a UVM student faced disciplinary action that included the possibility of suspension or dismissal if found responsible for alleged sexual misconduct, then the Due Process provisions of the Fourteenth Amendment to the United States Constitution applied to the disciplinary process that UVM used.

291.    UVM, as a public, land grant university established by the State of Vermont, and the Individual Defendants, as agents of UVM, have a duty to provide its students due process of law by and through any and all policies and procedures set forth by UVM.

292.    Prior to his suspension, Plaintiff was a student in good standing at UVM.

293.    Plaintiff was entitled to fundamentally fair procedures to determine whether he was responsible for the alleged sexual misconduct.

294.    Instead, Defendants flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through their deprivation of the minimal requirements of procedural fairness, by depriving him of: (i) an independent and, more importantly, impartial adjudicator; (ii) a right to cross-examination of his accuser; (iii) a live

adjudicatory hearing; (iv) a presumption of innocence; and (v) reasoned consideration of evidence as required by proper application of the burden of proof.

    295.    As the Supreme Court has set forth,

> identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

> *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

    296.    In the instant case, Plaintiff has a significant private interest in ensuring that he is not falsely adjudicated as a rapist. Not only does the University's decision have a considerable impact on his ability to continue his education at UVM and graduate on time, but it will also have life-long and far-reaching consequences. By way of example, and not limitation, virtually any graduate school or other institution of higher education, or future professional or governmental licensing application, to which Plaintiff would apply for admission and/or certification or licensing, will Plaintiff to disclose that was found responsible for Sexual Assault and suspended as a result. Needless to say, in the #MeToo era, employers and schools are not eager to admit those who are perceived as "sex offenders." In addition, Plaintiff's suspension will set back his graduation date, causing any future employer or educator who reviews his resume to speculate as to why Plaintiff did not complete his degree in four years, as planned.

    297.    The probable value of additional procedural safeguards—to wit, separation of the investigative and adjudicative responsibilities, a live-hearing, and the ability to cross-examine one's accuser—is extremely high, as it will lead to more accurate and reliable outcomes, which

will overall provide for a safer campus while avoiding the improper separation of an innocent student from his education.

298.    Finally, the State's interest in withholding such procedural safeguards is extremely weak. First of all, schools across the nation utilize separate investigators/adjudicators and live disciplinary hearings, indicating it is clearly a feasible process. Second, this case deals with accusations of sexual assault and sexual exploitation, which can result in separation from the University. On information and belief, the number of such cases that are processed through UVM's AAEO each year is extremely low. Moreover, UVM already has several employees it claims to be trained in Title IX processes: it would not need to hire additional Title IX staff, it would simply need to assign investigation to one such employee and adjudication to another. Likewise, the implementation of a hearing process with cross-examination in cases such as Plaintiff's would not impose a considerable burden on UVM.

299.    John Doe was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he was facing. The allegations, in this case, resulted in a sanction that will have lifelong ramifications for John Doe.

300.    In cases where credibility is at stake, cross-examination is required to ensure the reliability of the outcome of those proceedings and a fundamentally fair process. *See, e.g., Doe v. Baum*, 903 F.3d 575, 585-586 (6th Cir. 2018); *Lee v. Univ. of N. Mexico*, Case No. 1:17-cv-01239-JB-LF (D.N.M. Sept. 20, 2018); *Doe v. Allee*, 2019 WL 101616 (Cal. Ct. App., Jan 4, 2019); *Donohue v. Baker*, 976 F.Supp. 136 (N.D.N.Y. 1997).

301.    As one court noted, Title IX "enforcement officials often must make a credibility judgment between a male and female, which *doubles* the possibility of gender-specific stereotypes influencing the investigation" and maybe "the most likely circumstances in which gender bias,

explicit or implicit, will have an effect." *Doe v. CU Boulder*, 255 F. Supp. 3d 1064,1076, 1079 (D. Colo. 2017); *see also Goldberg v. Kelly*, 397 U.S. 254, 270 (1970) (noting need for cross-examination "where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings").

302. Yet, in a case where UVM relied upon a credibility assessment determined by a single investigator, there was no hearing, no sworn testimony and no cross-examination was available, in violation of due process of law.

303. Defendants UVM and the Board of Trustees violated Plaintiff's due process rights when they subjected him to a procedurally deficient single-investigator disciplinary process, in which Plaintiff was deprived a meaningful opportunity to be heard and to cross-examine his accuser, in a case that Defendant McCarthy explicitly relied upon a credibility analysis of the parties

304. Plaintiff was deprived of a meaningful opportunity to be heard because he was denied a live hearing before a neutral arbiter, and instead, had his fate decided by a biased, partial investigator who blatantly fabricated evidence against him in an attempt to corroborate Roe's baseless and largely disproven claims.

305. Ironically, the only time Plaintiff was permitted to attend a hearing was during his Sanctioning Hearing—where Plaintiff was insulted by the hostile chair and expressly prohibited from making any arguments as to his innocence or challenging the investigator's process or findings. Plaintiff was also denied the ability to cross-examine his accuser who added, by unsupported letter, an accusation of "premeditated" assault by Plaintiff, along with further unsupported aggravating factors included specifically to sway the panel.

306.    Defendant Spence, and after her McCarthy, violated Plaintiff's clearly established right to due process by conducting a patently gender-biased, victim-centric, skewed "investigation" that was functionally a prosecution, including Spence's demand Doe provides his cell phone under threat of being deemed incredible.  McCarthy then refused to entertain any questions, witnesses or evidence tending to impeach Roe's credibility; the former sex crime prosecutor posited clearly illogical interpretations of the parties' statements, and attempted to cast doubt on Plaintiff, and his supporting witnesses, while she blatantly bolstered Roe, and her supporting witnesses', credibility.

307.    Plaintiff was further deprived of a meaningful opportunity to be heard because he was denied a live appeal hearing before a neutral arbiter.  Instead, his appeal was decided by UVM's former General Counsel of nearly thirty years, who had a clear conflict of interest.

308.    Defendant Mercurio violated Plaintiff's clearly established right to due process by arbitrarily and capriciously rejecting the great majority of Plaintiff's appeal despite the overwhelming evidence in his favor, influenced heavily by Mercurio's conflict of interest in favor of the University as UVM's former counsel of nearly thirty years.

309.    Defendants deprived Plaintiff of his liberty and property interests without affording him basic due process, including, but not limited to, his right to a fair adjudication free of bias, his right to be innocent until shown to be responsible and not to be subjected to the burden of proving his innocence, his right to be heard by an impartial factfinder, to question his accuser, and to challenge the credibility of other adverse witnesses at a live hearing.

310.    Defendants subjected Plaintiff to an insufficient process when they failed to provide him with a fair and reasonable opportunity to defend himself and arrived at a predetermined, arbitrary and unwarranted decision tainted by gender bias and pro-accuser bias.

311.    Defendants failed to provide Plaintiff with the basic due process protections that they are required to provide to students accused of sexual misconduct who face possible suspension or expulsion.

312.    Defendants were acting under color of state law when they showed an intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

313.    Defendants all agreed to, approved, and ratified this unconstitutional conduct.

314.    Plaintiff has had his life permanently altered as a result of the arbitrary and outrageous conduct of Spence, McCarthy, Epshteyn, Mercurio, UVM, and the Board of Trustees.

315.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational opportunities, loss of career opportunities, economic injuries and other direct and consequential damages.

316.    Accordingly, Defendants are liable to Plaintiff pursuant to 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

317.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, punitive damages, prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as injunctive relief directing Defendants to (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii, ) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately deem Plaintiff as an enrolled student in good standing at UVM, and ensure Plaintiff's record reflect continuous good standing status; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

**AS AND FOR A SECOND CAUSE OF ACTION**
**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* -**
**Erroneous Outcome**
**(Against UVM)**

318.    Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

319.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

320.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, including Defendant UVM.

321.    Title IX is enforceable through a private right of action.

322.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student…complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (2018); 28 C.F.R. § 54.135(b) (2018) (emphasis added).

323.    The "prompt and equitable" procedures that a school must implement include, at a minimum: "Notice . . . of the procedure, including where complaints may be filed; Application of the procedure to complaints alleging harassment. .; [and] *[a]dequate, reliable, and impartial investigation of complaints*, including the opportunity to present witnesses and other evidence." Dep't of Ed., Office for Civ. Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (Jan. 19, 2001), at 20 (emphasis added).

324.    According to the 2001 Guidance, the procedures adopted by a school covered by Title IX must accord "due process to both parties involved." *Id.* at 22.

325.    According to the 2001 Guidance, schools are obligated under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'" *Id.* at 21.

326.    To succeed on an erroneous outcome claim, a plaintiff must demonstrate: (1) a flawed proceeding, which (2) led to an erroneous outcome; and (3) gender bias was a motivating factor behind the erroneous outcome.

327.    An erroneous outcome occurred in this case because Doe was subjected to a blatantly flawed proceeding and erroneously found to be responsible for violating UVM's sexual misconduct policy, and gender bias was a motivating factor behind this erroneous outcome.

328.    The proceedings were flawed and caused an erroneous outcome due to UVM's utilization of biased, partial investigators who conducted a fundamentally unfair, unreliable, and inadequate investigation, and whose fact-finding was not in compliance with the proper evidentiary standard, nor supported by the credible evidence, and by utilizing UVM's own counsel of thirty years as it's Student Appeals Officer, when it is clear that Mercurio's true obligation is to deny wrongdoing by UVM, rather than to provide a genuine, impartial, reasoned consideration of student appeals. By way of example and not limitation:

     a.  Plaintiff was presumed guilty from the start, and Roe was presumed credible from the start;

     b.  McCarthy viewed the many inconsistencies and incredible claims within Roe's variations on the encounter, including her varying accounts of when Doe digitally penetrated her and the key omission regarding Roe's stroking Doe's

penis until ejaculation, as mere imprecisions which, somehow, rendered Roe's recollection more credible, while actively utilizing any means to fabricate a lack of credibility on the part of Plaintiff;

c. McCarthy also used inappropriate, improper, and biased investigative techniques, including leading witnesses during questioning and ignoring evidence, questions, and witnesses who would tend to impeach Roe, including the witnesses who conspired to corroborate their stories with Roe or contributed to Roe's manufacturing corroborating evidence;

d. McCarthy deliberately misrepresented the statements and responses by Plaintiff and his supporting witnesses, in order to make them appear less credible, while misrepresenting statements and responses by Roe and her witnesses in order to make them appear more credible;

e. Spence forced Plaintiff to turn over his phone, draw diagrams and maps under threat of lost credibility, while not imposing said requirements on Roe;

f. McCarthy made nonsensical credibility determinations, including ignoring Roe's many inconsistencies, and her colluding with her witnesses prior to their interviews, especially Roe's unreported conversation with Professor Busier regarding the need for more corroborating evidence;

g. McCarthy failed to inquire about the content of conversations that Roe had with her supporting witnesses, even though nearly all of them indicated Roe had substantively discussed the investigation/claims with them prior to their interviews and explicitly conspired to ensure their stories matched up;

h.  McCarthy shockingly failed to account for, or highlight, the fact that a witness, SG, who provided a strong character witness for Doe, was accosted by Roe who repeated statements SG made in an allegedly confidential statement.  Roe improperly listened to SG's interview with McCarthy at AAEO, then attempted to attack SG when she left the room with McCarthy.  The confrontation was physical, as Roe cornered SG and violently yelled at her.  McCarthy, AAEO, and Defendants minimized the event completely and provided no protection to SG, who was intimidated, along with other potential witnesses, failed to attend the sanctioning hearing in support of Doe for legitimate fear of retaliation;

i.  Doe was likewise intimidated as Defendants failed to protect his rights throughout the process including, but not limited to, failing to keep the matter confidential as Doe was accepted then rejected from a leadership position on the outing club due to their knowledge of the accusations, failing to punish MK in any meaningful way after her admitted retaliation, and the clear message that neither Doe nor his supportive witnesses were as important, or worthy of Defendants' protection.

j.  McCarthy ignored probative witness statements, text messages, and reason which all patently discredited Roe's claims about being assaulted within feet of her dorm guests and further deemed material inconsistencies somehow *enhanced* her credibility;

k.  McCarthy refused to ask witnesses questions that would hurt Roe's credibility and only sought information that would support Roe's claims.

l.  McCarthy ignored the effect of alcohol on Roe's recollection, despite her reputation for excessive alcohol and drug consumption, but, conversely, improperly focused on Doe's alcohol consumption, historically less than Roe's, and his unrelated sexual history, to impeach his credibility;

m.  McCarthy, to that end, ignored Roe's history of alcohol abuse and drug experimentation and, instead, accepted Roe's unsupported contention that her drug use was caused by the alleged incident;

n.  McCarthy failed to apply the preponderance of the evidence and the presumption of innocence, instead of concluding that Plaintiff was responsible because the evidence—after being wildly distorted in Roe's favor—was allegedly "sufficient";

o.  McCarthy drew conclusions that were not supported by credible evidence in the record.  For example, McCarthy found Roe to be credible in large part because of the "details" of Roe's claims, even though nearly all of the details Roe provided were either directly contradicted or jointly fabricated with Roe's witnesses;

p.  McCarthy did not properly corroborate Roe's claims, even ignoring the fact Roe lied about something as insignificant as ordering an Uber with suspect excuses for her failure to provide receipts;

q.  McCarthy interpreted similar facts in favor of Roe but against Plaintiff.  For example, Spence concluded that Roe's willingness to admit to gaps in her memory increased her credibility, yet the gaps in Doe's memory left him unable

to directly counter Roe's gaps and fabrications, somehow rendering him less credible;

r.  McCarthy placed the burden on Plaintiff to disprove Roe's allegations and affirmatively prove his innocence, in violation of relevant laws, regulations, and UVM policy;

s.  McCarthy interpreted evidence that contradicted Roe's claims as somehow corroborating them as described above;

t.  There was *no independent corroborating evidence* of Roe's claims that Plaintiff engaged in any sexual activity with her against her consent as noted by Roe and Busier in their off-the-record conversation prior to Roe's filing a report with AAEO. Despite knowledge of this suspicious conversation, McCarthy still accepted a self-interested, highly suspicious journal entry as the key corroboration. The investigator failed to probe the legitimacy of this alleged journal entry, which amounted to two pages of loose paper. In reality, there was abundant evidence that directly contradicted and disproved Roe's version of events and the legitimacy of the journal entry;

u.  McCarthy picked and chose which pieces of evidence were "reliable" based on which pieces supported Roe's claims;

v.  McCarthy concluded that Roe was the "more credible" party even though she gave wildly inconsistent descriptions to key issues like consent and her own sexual touching of Doe. McCarthy no doubt chalked all of Roe's "imprecision" up to Roe's alleged trauma;

w. In her Final Report, McCarthy accepted all of Roe's allegations as "facts," which she included in her findings, and failed to mention Professor Busier, the professor's failure to report the conversation in violation of the policy or the conversation between Roe and Busier discussing the lack of evidence in support of the "he said, she said" claim;

x. All in all, McCarthy catered both her investigation and her conclusions to her predetermined findings of guilt;

y. UVM's Student Appeals Officer, its former counsel of nearly thirty years, ignored a clear conflict of interest, as Mercurio's entire career with UVM was built on protecting UVM from findings of liability for any wrongdoing; and

z. Mercurio's unnecessarily confrontational and contentious denial of the majority of Plaintiff's appeal, specifically the unsupported findings of responsibility and questionable investigator conduct indicative of bias, was in stark contrast to his reduction of the absurdly harsh sanction and indicated an intent to insulate UVM from costlier damages and litigation, rather than to conduct a genuine, impartial assessment of Plaintiff's appeal.

329. These clear procedural irregularities and unilateral favoritism of Jane Roe, combined with the negative press coverage and extensive evidence of public pressure upon UVM to act based on invidious stereotypes, establish, at a minimum, a plausible inference of UVM's discrimination of its male students. Such particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose discipline upon Plaintiff. These circumstances include, by way of example and not limitation:

a. UVM's use of an improper and gender-biased Title IX training, which, on information and belief, focused on supporting female complainants and prosecuting male respondents;

b. The pressure created by the ongoing OCR investigation, which was the second complaint made to OCR alleging that UVM failed to adequately address sexual misconduct committed against female students;

c. Consistent pressure from the UVM student body and public pressure exerted through bad press and media coverage, to specifically punish/banish men *accused of* misconduct, and to support female assault survivors;

d. Consistent pressure from the UVM student body and staff to automatically believe female reporters of sexual abuse, as exemplified in the "mattress girl" recreation protest and the open letter regarding Brett Kavanaugh;

e. UVM's presentation of the controversial documentary *The Hunting Ground*, which, on information and belief, focuses on female victims and male assailants;

f. UVM's promise to "consistently hold people accountable" for sexual assault claims;

g. Pressure from the UVM student government to "side with victims," rather than to conduct impartial investigations and adjudications;

h. Pressure from the UVM student body not to embrace the proposed Title IX regulations, because according to respondents more rights will "protect rich white boys;"

i.   Pressure from the UVM student body to address the "rape problem" on campus, which is consistently framed by students and by the UVM school paper as an issue exclusively affecting women and perpetrated by men;

j.   UVM's employment of only a single Victim's Advocate, who is female;

k.   UVM's housing of the only Victim's Advocate in the UVM Women's Center, whose mission is specifically to support and protect UVM's female students;

l.   UVM's provision of a dedicated advocate for female complainants, whereas respondents are only entitled to volunteer procedural "advisors";

m.   UVM's receipt of over a million dollars in OVW grant money for the express purpose of building out the Women's Center, supporting complainants and harshly prosecuting respondents;

n.   UVM's female-centric "trauma-informed" training and policies, including the direction to presume the complainant is credible and to view the evidence from the complainant's perspective, the training's exclusive use of male pronouns to describe attackers and female pronouns to describe victims, and the training's reliance on a discredited, gender-biased study;

o.   UVM's use of the single-investigator model, and protecting complainants from cross-examination, despite the 2017 OCR guidance and incoming Final Title IX Rule which became effective August 14, 2020, but was detailed, known and willfully ignored by Defendants at all relevant times herein;

p.   McCarthy's application of gender-based double standards in evaluating the evidence as outlined in Paragraph 329(a)-(z) above; one of the blatant double standards, by example, is McCarthy finding that Roe's memory gaps rendered

her more credible, while Plaintiff's rendered him less credible as she ignored Roe's reputational prowess for drinking heavily and drug experimentation; and

q. Roe's contention that UVM must punish Plaintiff in order to prove to her and other *female* students that UVM cares about keeping campus safe for them;

330. From the start, the investigation was slanted in favor of the female complainant. Her story was deemed more credible from the beginning and given more weight in the final analysis and determination of what occurred despite the *overwhelming evidence* refuting her claims.

331. On information and belief, UVM's mishandling of the complaint was informed by internal and external pressure to believe female accusers and punish the male accused, the ongoing OCR investigation, pressure from the press, the United States Department of Education under a threat of recession of federal funds, and UVM's gender-biased and improper Title IX training.

332. Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX, resulting in an erroneous outcome.

333. This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain a substantial injury, damage, and loss, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

334. As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as injunctive relief directing UVM to (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently

destroy any record of Jane Roe's complaint; (v) immediately deem Plaintiff as an enrolled student in good standing at UVM, and ensure Plaintiff's record reflect continuous good standing status; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

**AS AND FOR A THIRD CAUSE OF ACTION**
**9 V.S.A. § 4502: Discrimination in Public Accommodation**
**(Against Defendants Board of Trustees, Spence, and Mercurio)**

335.     Plaintiff John Doe repeats and realleges each and every allegation above as though fully set forth herein.

336.     Vermont's Discrimination in Public Accommodations Act, 9 V.S.A. § 4502, states: "an owner or operator of a place of public accommodation or an agent or employee of such owner or operator shall not, because of the race, creed, color, national origin, marital status, sex, sexual orientation, or gender identity of any person, refuse, withhold from, or deny to that person any of the accommodations, advantages, facilities, and privileges of the place of public accommodation."

337.     "The [DPA] requires all Vermont schools to comply. . . . In addition, the [Act] . . . provides an express private right of action." *Washington v. Pierce*, 895 A.2d 173, 184 (VT 2005).

338.     As described in detail above, Defendants Board of Trustees, Spence, and Mercurio have denied Plaintiff access to the accommodations, advantages, facilities, and privileges of UVM on the basis of his gender.

339.     Plaintiff was subjected to a biased, discriminatory, prosecutorial Title IX proceeding in violation of UVM policies and relevant laws and regulations, based upon and/or motivated by his gender.

340.    Plaintiff has exhausted his administrative remedies by appealing the Finding and Sanction.  UVM denied Plaintiff's appeal, but for the reduction of the dismissal/expulsion to a one-year suspension, on July 26, 2019, and Plaintiff has no further recourse under the relevant school policies.

341.    Based on the foregoing, Plaintiff was denied access to the accommodations, advantages, facilities, and privileges of UVM on the basis of his gender, in violation of the DPA.

342.    This unlawful discrimination proximately caused Plaintiff to sustain a substantial injury, damage, and loss, including, without limitation, emotional distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

343.    As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements, as well as injunctive relief directing UVM to (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately deem Plaintiff as an enrolled student in good standing at UVM, and ensure Plaintiff's record reflect continuous good standing status; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed.

## AS AND FOR A FOURTH CAUSE OF ACTION
### Breach of Contract/Quasi Contract
### (Against UVM)

344.    Plaintiff John Doe repeats and re-alleges each and every allegation above as though fully set forth herein.

345.    Vermont law recognizes that the relationship between a student and a college is contractual in nature. *Knelman v. Middlebury Coll.*, 898 F.Supp.2d 697, 708 (D. Vt. 2012).

346.    At all times relevant hereto, a contractual relationship existed between Plaintiff and UVM through UVM's policies and procedures governing the student disciplinary system, including but not limited to the Sexual Harassment and Misconduct Policy.

347.    Through the documents it publishes and provides to students, UVM makes express and implied contractual commitments to students involved in a disciplinary process.

348.    Based on the aforementioned facts and circumstances, UVM created to express and implied contracts when it offered, and Plaintiff accepted, admission to UVM and paid the required tuition and fees.

349.    These contracts contained an implied covenant of good faith and fair dealing. They implicitly guaranteed that any proceedings would be conducted with basic fairness.

350.    UVM breached its express and implied contracts with Plaintiff as well as violated the implied covenant of good faith and fair dealing. Such breaches include, by way of example and not limitation:

   a.   Fabricating evidence against Plaintiff, and intentionally omitting/failing to investigate exculpatory evidence or evidence which tended to impeach Roe;

   b.   Failing to conduct a fair, impartial, equitable and thorough investigation;

   c.   Failing to diligently review and consider the evidence in the case;

d.  Failing to properly consider the relevance, materiality, and credibility of the evidence;

e.  Failing to abide by principles of fairness;

f.  Failing to respect the rights of the parties, specifically, Plaintiff as the male respondent;

g.  Failing to apply the preponderance of the evidence standard;

h.  Failing to impose sanctions "commensurate with the nature and severity of violation(s) found to have occurred by a preponderance of the evidence;"

i.  Failing to properly apply the factors for consideration in imposing an unduly harsh, unwarranted, unreasonable sanction;

j.  Failing to acknowledge and properly weigh the relevant mitigating factors, and dismiss unsupported aggravating factors;

k.  Considering improper factors, such as Roe's defamatory attacks on Plaintiff and her calls for protection of female students, in assigning Plaintiff an unduly harsh and unwarranted sanction;

l.  Utilizing a biased, partial, and conflicted Student Appeals Officer;

m.  Failing to give due and proper consideration for Plaintiff's entire appeal, which provided ample evidence for reversal based upon the stated grounds for appeal; and

n.  Failing to acknowledge or adequately remedy procedural and substantive violations brought to its attention.

351.  As a proximate result of the foreseeable consequence of the foregoing breaches, Plaintiff sustained a substantial injury, damage, and loss, including, without limitation, emotional

distress, psychological damages, loss of educational and career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

352.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

i.    On the First Cause of Action for violation of 42 U.S.C. § 1983, Procedural Due Process, a judgment against all Defendants awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction directing Defendants to: (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v immediately deem Plaintiff as an enrolled student in good standing at UVM, and ensure Plaintiff's record reflect continuous good standing status; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

ii.    On the Second Cause of Action for violation of Title IX of the Education Amendments of 1972, Erroneous Outcome, a judgment against UVM awarding Plaintiff damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and an injunction directing UVM to: (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately deem Plaintiff as an enrolled student in good standing at UVM, and ensure Plaintiff's record reflect continuous good standing status; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

iii.    On the Third Cause of Action for violation of the Discrimination in Public Accommodations Act, a judgment against Defendants Board of Trustees, Spence, and Mercurio awarding Plaintiff damages in an amount to be determined at trial plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, as well as injunctive relief directing Defendants to: (i) reverse the findings and

sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately deem Plaintiff as an enrolled student in good standing at UVM, and ensure Plaintiff's record reflect continuous good standing status; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed;

iv.  On the Fourth Cause of Action for Breach of Contract, a judgment against UVM awarding Plaintiff damages in an amount to be determined at trial, plus punitive damages, prejudgment interest, attorneys' fees, expenses, costs, and disbursements;

v.   Equitable relief, including but not limited to an injunction directing UVM and/or the individual defendants to (i) reverse the findings and sanction regarding Jane Roe's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his educational/academic/disciplinary file and/or transcript; (iv) permanently destroy any record of Jane Roe's complaint; (v) immediately deem Plaintiff as an enrolled student in good standing at UVM, and ensure Plaintiff's record reflect continuous good standing status; and (vi) issue an update/correction to any third parties to whom Plaintiff's disciplinary record may have been disclosed; and

vi.  Such additional, other, or further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all issues so triable in this action.

Dated: July 26, 2022

Respectfully Submitted,
JOHN DOE, PLAINTIFF
By his attorneys

/s/ Evan Barquist, Esq.
By: Evan Barquist, Esq
Montroll, Oettinger & Barquist, P.C.
126 College St, Suite 400
Burlington, VT 05402
802-540-0250
ebarquist@mblawoffice.com

- and -

*/s/ Andrew T Miltenberg, Esq.*

Andrew T. Miltenberg, Esq. (*pro hac vice*)
Nicholas Lewis, Esq. (*pro hac vice*)
**NESENOFF & MILTENBERG, LLP**
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
nlewis@nmllplaw.com
(*PRO HAC VICE* ADMISSIONS PENDING)

**Attorneys for Plaintiff John Doe**